**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BETHANIE KEEM-CALHOUN and AMANDA SAYGI, *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>CENTRALUS HEALTH, INC.,<br><br>Defendant. | Case No. 3:26-cv-1602 (BKS/ML)<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Bethanie Keem-Calhoun and Amanda Saygi, through their attorneys, bring this class action lawsuit in their individual capacities and on behalf of all others similarly situated against Centralus Health, Inc. ("Centralus" or "Defendant"). Plaintiffs allege the following based on their personal knowledge, their counsel's investigation, certain facts in the public record, and, where indicated, upon information and good faith belief.

## INTRODUCTION

1. Defendant Centralus is a regional healthcare system that serves the Southern Tier, Finger Lakes, and Central New York regions of New York state. Formed in 2025 through the merger of Cayuga Health and Arnot Health, Centralus's healthcare network now includes five hospitals, multiple urgent care centers, laboratory and imaging facilities, and a multi-specialty medical group that offers a broad range of primary and specialty care services, including bariatrics, cancer treatment, dermatology, ENT, endocrinology, gastroenterology, heart and vascular, intensive and cardiac care, labor and delivery, neurology and neurosurgery, orthopedics,

pulmonary medicine, psychiatric care, general surgery, and urology.[1]

2. Centralus employs approximately 6,500 workers and generates roughly $1 billion annually in patient services.[2]

3. As part of the medical services it provides, Centralus owns, operates, controls, and maintains three websites: (a) the Centralus Health website, located at https://centralushealth.org/; (b) the Cayuga Health website, located at https://cayugahealth.org/; and (c) the Arnot Health website, located at https://www.arnothealth.org/ (collectively, the "Websites"). The Websites allow Centralus patients (and potential patients) to search for and view medical providers and services offered by Centralus, as well as hospital and office locations and contact information, among other things.

4. The Centralus Websites also enable patients to request appointments for medical care and to access the MyChart Patient Portals, on which Centralus patients can, *inter alia*, remotely access their medical records, review their test results, schedule and view appointments, communicate with their providers, renew their prescriptions, and pay outstanding medical bills.

5. Centralus actively encourages patients to use its Websites to search for medical providers, office locations, and services, to request appointments, and to access the MyChart portal to pay their medical bills, access their medical records and test results, and communicate with their providers.

6. Indeed, Centralus specifically invites patients to search for and share detailed

---

[1] *See https://centralushealth.org/; see also* https://www.chiefhealthcareexecutive.com/view/new-york-hospitals-complete-merger-and-unveil-new-name?#:~:text=Centralus%20employs%206%2C500%20workers%20and%20through%20the%20partnership%2C%20the%20system%20said%20it%20offers%20%241%20billion%20annually%20in%20patient%20services (last visited Jul. 30, 2026).

[2] *See id.*

information about their own physical and mental health via its Websites. And Centralus patients, trusting that this information will be safeguarded, in fact share their most intimate and personal medical information with Centralus through the Websites.

7. Personal medical information concerning individuals' physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of such information can have serious consequences, including but not limited to discrimination in the workplace and/or denial of insurance coverage.[3]

8. Centralus patients and potential patients who visited and used the Centralus Websites (collectively, the "Users") – including Plaintiffs and Class Members – understandably thought that, in using the Websites, they were exchanging information and communicating only with their trusted healthcare providers.

9. Unbeknownst to the Users, however, Centralus was in fact collecting their sensitive medical and health-related information – including both their personally identifiable information ("PII") and their protected health information ("PHI") (collectively referred to as "PII/PHI" or "Private Information")[4] – and sharing that Private Information with third parties, specifically Google and The Trade Desk, without the Users' knowledge, and without providing any notice to

---

[3] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022), available at https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ (last visited Jul. 30, 2026) ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized.").

[4] PHI is any health-related data (like medical records, test results, medical bills, or treatment or provider information) that is handled by healthcare providers and includes specific patient identifiers (names, Social Security numbers, birth dates, etc.). PHI is strictly protected by the Health Insurance Portability and Accountability Act ("HIPAA") privacy rule. PII is any information that can be used to identify a person across any industry. PII is generally *not* protected by HIPAA *unless* it is or can be linked to a person's health-related data.

the Users or obtaining the Users' consent to do so, in violation of federal and state law and Centralus's own policies.

10. Specifically, Centralus embedded at least two undetectable "trackers" on its Websites – Google's DoubleClick and The Trade Desk – which trackers collect and transmit to Google and The Trade Desk an incredible amount of personal and protected data about Users of the Websites.[5] The interception, collection, and transmission of this Private Information is instantaneous, invisible, and occurs without any notice to (or consent from) the Users.

11. Indeed, despite intentionally incorporating these tracking technologies into its Websites and servers, Centralus never informed its Users that the Private Information they communicated via its Websites was being collected and intentionally disclosed to Google, The Trade Desk, or any other third party. Nor did Centralus ever seek or obtain its Users' consent to disclose their Private Information to these third parties.

12. To the contrary, Centralus's Privacy Policies ***expressly denied*** that Centralus would share its Users' identifiable healthcare information with any third parties without its Users' express written consent.[6]

13. Despite this, and unbeknownst to Plaintiffs and Class Members, Centralus did exactly that, installed tracking technologies on its Websites that collected information – including Users' Private Information – from the Users and disclosed that information to unauthorized third parties like Google and The Trade Desk for Centralus's own pecuniary gain.

---

[5] The trackers themselves are small snippets of code placed on webpages by the website owner. The process of adding the trackers to a webpage is a multi-step process that, as described in detail in Secs. B&C, *infra*, must be undertaken by the website owner, namely, Centralus.

[6] *See* Cayuga Health cookie banner, available at https://cayugahealth.org/; *see also* Arnot Health Privacy Policy, available at https://www.arnothealth.org/privacy; Cayuga Health Privacy Policy, available at https://cayugahealth.org/privacy-policy/ (last visited Jul. 30, 2026).

14. The information that Centralus collected from its Users and transmitted to Google, The Trade Desk, and/or other third parties via its tracking technologies includes, but is not limited to, the following: (a) Users' access to the Centralus Patient Portal; (b) the text of Users' search queries; (c) medical services and treatments sought by Users; (d) Users' searches for providers and views of provider profiles; (e) Users' searches for medical facilities and locations; (f) Users' accessing and viewing the bill pay webpage; (g) the URLs visited by Users on the Websites; and (h) other information that qualifies as PII and/or PHI under federal and state laws, such as the User's name, email address, phone number, zip code, and city of residence entered on the Websites.

15. Worse, Centralus's tracking technologies linked this information to its Users' specific internet protocol ("IP") address, device identifiers, email addresses, and/or unique Google accounts – which often contain a User's first and last name, email address(s), phone number(s), and physical address – to create for each User a detailed "data packet" that is shared with Google and The Trade Desk for marketing and analytics purposes.[7] These data packets containing the Users' PII and PHI are then used by Centralus and third parties, for example, to send targeted advertisements to Users based on their sensitive and protected Private Information, or to gain additional insights into how Users use certain websites.[8]

16. HIPAA sets forth certain requirements designed to protect the privacy and

---

[7] These data packets may also include, *e.g.*, the buttons a User clicks and/or the words a User types into the search bar on the Centralus Websites.

[8] Centralus unquestionably was required to inform its Users that it had deployed tracking technologies on its Websites so that those Users could make an informed decision as to whether they wanted their information to be collected, disclosed, and used in this manner. *See* OCR Bulletin, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (emphasis added), available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Jul. 30, 2026) ("disclosures of PHI to tracking technology vendors for marketing purposes, ***without individuals' HIPAA-compliant authorizations,*** would constitute impermissible disclosures.").

confidentiality of all individually identifiable health information, or PHI, that is held or transmitted by a medical provider. Specifically, the HIPAA privacy rule prevents a medical provider from disclosing a patient's PHI without the patient's express, written consent.

17. Additionally, HIPAA lists approximately eighteen (18) "identifiers" which either identify or can be used to identify, contact, or locate an individual, alone or in combination with other sources. These identifiers, which include names, dates related to an individual, email addresses, device identifiers, web URLs, and IP addresses,[9] are considered PII but are not protected by HIPAA *unless* they are or can be linked an individual's health-related data.

18. Operating as designed and as implemented by Centralus, the tracking technologies that Centralus installed on its Websites intercept and share with third parties Google and The Trade Desk both Users' protected *PHI* – information such as when and where a specific User was seeking confidential medical care, for what medical condition, and the precise care they sought or received – and their *PII* – the specific User's email address, IP address, and/or device identifier, which is then connected with the User's medical information and becomes protected. Google and The Trade Desk are then able to use this collection of Private Information to build incredibly fulsome and robust marketing profiles for individual Users and create targeted advertisements for each User based on their own Private Information.

19. By installing these tracking technologies on its Websites, Centralus effectively planted a bug on the web browsers of its Users, including Plaintiffs and the Class Members, and caused them to unknowingly disclose their private, sensitive, and confidential health-related

[9] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, available at https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Jul. 30, 2026).

communications to Google and The Trade Desk through Centralus, for Centralus's profit.

20. In so doing, Centralus put its desire for profit over its patients' privacy rights.

21. As described in detail below, covered healthcare providers such as Centralus are not permitted to use tracking technology tools like Google's DoubleClick and The Trade Desk in a way that exposes patients' Private Information to any third party without each patient's express and informed consent. And Centralus never sought or received such consent from either Plaintiffs or the Class Members, the Users of its Websites.

22. As recognized by both the Federal Trade Commission ("FTC") and the Office for Civil Rights ("OCR") of the Department of Health and Human Services ("HHS"), healthcare companies' use of tracking technologies to collect and divulge their patients' sensitive and confidential information is an extremely serious data security and privacy issue:

> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.***[10]

23. Similarly, OCR is clear that **"[r]egulated entities [*i.e.*, healthcare providers to which HIPAA applies] are *not* permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."**[11]

24. As a healthcare provider, Centralus had certain duties and obligations to its patients

---

[10] *See* Elisa Jillison, *Protecting the Privacy of Health Information: A Baker's Dozen Takeaways from FTC Cases,* Program on Corporate Compliance and Enforcement at New York University School of Law (Sept. 4, 2023) (emphasis added), available at https://wp.nyu.edu/compliance_enforcement/2023/09/04/protecting-the-privacy-of-health-information-a-bakers-dozen-of-takeaways-from-ftc-cases/ (last visited Jul. 30, 2026).

[11] *See* OCR Bulletin, *supra* note 8.

and Users of its Websites, including Plaintiffs and Class Members. Centralus breached those duties and obligations in one or more of the following ways: (a) by failing to adequately review its marketing programs and web-based technology to ensure the Websites were safe and secure; (b) by installing, or by failing to remove or disengage, technology that was known and designed to share web Users' information; (c) by failing to obtain Users' consent to disclose their PII and PHI to Google, The Trade Desk, or other third parties; (d) by failing to take steps to block the transmission of Users' PII and PHI through its tracking technologies; (e) by failing to warn Users; and (f) by otherwise failing to design and monitor its Websites to maintain the confidentiality and integrity of Users' PII and PHI.

25. Plaintiffs and Class Members have suffered injury because of Centralus's conduct; these injuries include: (a) invasion of privacy, (b) loss of benefit of the bargain, (c) compromise and disclosure of their Private Information, (d) diminution of value of their Private Information, (e) statutory damages, and (f) the continued and ongoing risk to their Private Information.[12]

26. Plaintiffs seek to remedy these harms for themselves and a class of all others similarly situated and therefore assert causes of action for (a) Violations of the Electronic Communications Privacy Act (18 U.S.C. § 2510, *et seq.*); (b) Negligence; (c) Breach of Implied Contract; (d) Breach of Fiduciary Duty; (e) Unjust Enrichment; (f) Breach of Confidence; (g) Constructive Bailment; (h) Implied Covenant of Good Faith and Fair Dealing; and (i) Violation of New York's Deceptive Trade Practices Act (New York Gen. Bus. Law § 349).

## PARTIES

27. Plaintiff Bethanie Keem-Calhoun is a natural person residing in Chemung County

[12] The exposed Private Information of Plaintiffs and Class Members can – and likely will – be further disseminated to additional third parties utilizing the data for retargeting or insurance companies utilizing the information to set insurance rates. Furthermore, third parties often offer for sale the unencrypted, unredacted Private Information to criminals on the dark web for use in fraud and cyber-crimes.

in the State of New York, where she intends to remain.

28. Plaintiff Amanda Saygi is a natural person residing in Tioga County in the State of New York, where she intends to remain.

29. As detailed herein, Plaintiffs accessed Centralus's Websites on their computers and/or mobile devices and used the Websites, *inter alia*, to search for providers and hospital/office locations, to review conditions and treatments, to request appointments, and to access the MyChart portal to communicate with their providers, view test results, and/or pay medical bills.

30. Defendant Centralus Health, Inc. is a registered non-profit entity with its headquarters, principal place of business and main campus at 101 Dates Drive, Ithaca, New York 14850. Defendant Centralus was formed in 2025 through the merger of Arnot Health and Cayuga Health, which continue to operate as affiliated entities under the Centralus umbrella.

31. Defendant Centralus is a covered entity under HIPAA.

**JURISDICTION & VENUE**

32. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because certain of Plaintiffs' claims arise under the laws of the United States, and under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of each class is a citizen of a state different from Defendant.

33. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because Plaintiffs' state-law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

34. This Court has personal jurisdiction over Defendant because its principal place of

business is in this District and a substantial portion of the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

35. Venue is proper in this judicial district under 28 U.S.C. § 1391 (a) through (d) because: (a) a substantial part of the events giving rise to this action occurred in this judicial district, including decisions made by Centralus's governance and management personnel or inaction by those individuals that led to the unauthorized sharing of Plaintiffs' and Class members' Private Information; (b) Centralus's principal place of business is located in this judicial district; (c) Centralus collects and redistributes Class members' Private Information in this judicial district; and (d) Centralus caused harm to Class members residing in this judicial district.

## COMMON FACTUAL ALLEGATIONS

### *A. Federal Regulators Make Clear That the Use of Tracking Technologies to Collect & Divulge Private Health Information Without Patients' Informed Consent Is Illegal.*

36. The surreptitious collection and divulgence of Private Information is an extremely serious data security and privacy issue. Both the Federal Trade Commission ("FTC") and the Office for Civil Rights of the HHS have reiterated the importance of and necessity for data security and privacy concerning health information.

37. For instance, in 2023, the FTC's Business Blog published a bulletin entitled *Protecting the Privacy of Health Information: A Baker's Dozen of Takeaways from FTC Cases*, in which it noted that "[h]ealth information isn't just about medications, procedures, and diagnoses. **Rather, it's *anything that conveys information – or enables an inference – about a consumer's health*.** Indeed, [recent FTC enforcement actions involving] *Premom*, *BetterHelp*, *GoodRx*, and *Flo Health* **make clear that *the fact that a consumer is using a particular health-related app or website – one related to mental health or fertility, for example – or how they interact with that***

***app (say, turning 'pregnancy mode' on or off) may itself be health information."***[13]

38. Indeed, the FTC has unequivocally stated that healthcare companies should ***not*** use tracking technologies to collect sensitive health information and disclose it to various platforms without a patient's informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.**
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.*** [Recent FTC enforcement actions such as] *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that practices like that ***may run afoul [of] the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information***.[14]

39. The federal government is taking these violations of health data privacy and security seriously, as evidenced by past high-profile FTC settlements with several telehealth companies.

40. For example, in 2023, the FTC imposed a $1.5 million penalty on GoodRx for violating the FTC Act by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook, Google, and Criteo. The FTC also reached a $7.8 million settlement with the online counseling service BetterHelp, resolving allegations that the company shared customer health data with Facebook and Snapchat for advertising purposes. Likewise, the FTC reached a settlement with Flo Health, Inc. regarding information about fertility and pregnancy

---

[13] *See* Jillison, *Protecting the Privacy of Health Information, supra* note 10 (emphasis added).

[14] *Id.* (emphasis added) (further noting that *GoodRx* & *Premom* underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC and, in some cases, the media, of disclosures of health information without consumers' authorization).

that the Flo fertility-tracking app was improperly sharing with Facebook, Google, and other third parties. And Easy Healthcare was ordered to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premom shared health data for advertising purposes.[15]

41. And in July 2023, federal regulators sent a letter to approximately 130 healthcare providers warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[16]

---

[15] *See* Jill Hughes, *How FTC Enforcement Actions Will Impact Telehealth Data Privacy*, available at https://healthitsecurity.com/features/how-ftc-enforcement-actions-will-impact-telehealth-data-privacy (last visited Jul. 30, 2026); *see also* Allison Grande, *FTC Targets GoodRx In 1st Action Under Health Breach Rule*, Law360 (Feb. 1, 2023), available at www.law360.com/articles/1571369/ftc-targets-goodrx-in1st-action-under-health-breach-rule?copied=1 (last visited Jul. 30, 2026); *FTC Gives Final Approval to Order Banning BetterHelp from Sharing Sensitive Health Data for Advertising, Requiring It to Pay $7.8 Million*, available at https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising (last visited Jul. 30, 2026); Ovulation Tracking App Premom Will be Barred from Sharing Health Data for Advertising Under Proposed FTC Order, available at https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc (last visited Jul. 30, 2026); *FTC Finalizes Order with Flo Health, a Fertility-Tracking App that Shared Sensitive Data with Facebook, Google, and Others*, available at https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-health-fertility-tracking-app-shared-sensitive-health-data-facebook-google (last visited Jul. 30, 2026).

[16] *See* FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies (Jul. 20, 2023), available at https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking (last visited Jul. 30, 2026).

42. The Office for Civil Rights at HHS has made clear, in a 2024 bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, that the transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[17]

43. The OCR Bulletin reminds healthcare organizations regulated under HIPAA that they may use third-party tracking tools such as Google Analytics or Pixels *only in a limited way*, to perform analysis on data key to operations. But they are **not** permitted to use these tools in a way that may expose patients' PHI to third party vendors.[18]

44. The OCR Bulletin specifically discusses the harms that disclosure may cause patients:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.*** Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.***
>
> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[19]

---

[17] *See* OCR Bulletin, *supra* note 8 (emphasis added).

[18] *See id.*

[19] *Id.* (emphasis added).

45. Moreover, investigative journalists have published several reports detailing the seemingly ubiquitous use of tracking technologies on the digital properties of hospitals, health care providers, and telehealth companies to monetize their Users' Private Information.

46. For instance, in 2022, THE MARKUP reported that 33 of *Newsweek's* top 100 hospitals in the America utilized the Meta Pixel to send Facebook a packet of data whenever a person clicked a button to schedule a doctor's appointment.[20]

47. And, in the aptly titled report *"Out of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies*, a joint investigation by STAT and THE MARKUP of 50 direct-to-consumer telehealth companies reported that telehealth companies or virtual care websites were providing sensitive medical information they collect to the world's largest advertising platforms.[21]

48. Many healthcare sites had at least one tracker – from Meta, Google, TikTok, Bing, Snap, Twitter, LinkedIn and/or Pinterest – that collected patients' answers to medical intake questions.[22]

---

[20] *See* Todd Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP (Jun. 16, 2022), available at https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last visited Jul. 30, 2026).

[21] Todd Feathers, Katie Palmer (STAT) & Simon Fondrie-Teitler, *"Out Of Control": Dozens of Telehealth Startups Sent Sensitive Health Information to Big Tech Companies: An investigation by The Markup and STAT found 49 out of 50 telehealth websites sharing health data via Big Tech's tracking tools* (Dec. 13, 2022), available at https://themarkup.org/pixel-hunt/2022/12/13/out-of-control-dozens-of-telehealth-startups-sent-sensitive-health-information-to-big-tech-companies (last visited Jul. 30, 2026).

[22] *See id.* (noting that "[t]rackers on 25 sites, including those run by industry leaders Hims & Hers, Ro, and Thirty Madison, told at least one big tech platform that the user had added an item like a prescription medication to their cart, or checked out with a subscription for a treatment plan").

### *B. The Tracking Technologies Used by Centralus on Its Websites.*

#### *1. Google's DoubleClick.*

49. Google operates multiple tracking technologies that collect and compile user data in order to enable website owners to enhance user experience, personalize content, and implement effective targeted advertising, among other things.

50. One such technology is DoubleClick, a digital advertising platform acquired by Google that has been fully integrated into Google's advertising ecosystem as part of the Google Marketing Platform.

51. DoubleClick is an advertising tracking tool designed to collect information about user behavior on websites for the purpose of improving the targeting and effectiveness of advertising campaigns. It does this by utilizing "cookies"[23] and other device identifiers such as IP addresses to build independent profiles on users, based on the users' browsing activity, and then it uses those profiles to support targeted advertising initiatives directed at the users.[24] By collecting users' unique IP addresses, DoubleClick can identify users regardless of whether they have pre-existing Google accounts.[25]

52. Stated otherwise, DoubleClick collects users' browsing behavior from participating websites, connects that behavior to a specific IP address, and utilizes information – which can include Private Information – to show the users personalized ads based on their browsing behavior.

53. Specifically, when a User visits a participating website – such as Centralus's Websites – DoubleClick creates an "IDE" cookie, which is generated by the User's web browser,

---

[23] "Cookies are small files of information that a web server generates and sends to a web browser. … Cookies help inform websites about the user, enabling the websites to personalize the user experience." *See* https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jul. 30, 2026).

[24] *See* https://support.google.com/faqs/answer/2727482?hl=en (last visited Jul. 30, 2026).

[25] *See id.*

is stored on the User's computer, and can be used to uniquely identify the User.

54. The IDE cookie is a persistent advertising identifier that is used to show personalized Google ads on non-Google sites. It plays a central role in tracking users' interactions across the web, building user profiles based on the user's web activity for cross-site ad targeting. The IDE cookie increases advertising effectiveness by tracking actions that users take after viewing or clicking on advertisements, such as visiting specific pages or completing transactions, and connects those actions with the individual user, thus enabling the delivery of personalized ads to users based on their prior actions.

55. The IDE cookie is unique to each user and may be used to identify or single out individuals; thus, it constitutes PII.

56. DoubleClick collects and stores Users' IP addresses and other PII in its server logs, along with its cookies that uniquely identify browsers and users. Indeed, Google expressly concedes:

> **We store a record of the ads we serve in our logs. These server logs typically include your web request, IP address, browser type, the date and time of your request, and one or more cookies that may *uniquely identify your browser or*, if you are signed in, *uniquely identify you*.**[26]

57. Accordingly, Google's advertising infrastructure records IP addresses together with cookie-based identifiers. And, for Users who are signed in to their Google accounts, it can affirmatively link this data to individual by name via his or her Google account.

***2. The Trade Desk***

58. The Trade Desk is a digital advertising platform that provides technology to help advertisers and their agencies manage digital advertising campaigns across many channels. The

[26] Google Privacy & Terms, *How Google uses cookies in advertising*, available at https://policies.google.com/technologies/ads?hl=en-US (last visited Jul. 30, 2026).

Trade Desk uses tracking pixels and cookies to track users' browsing activity online. This data helps deliver targeted advertising based on users' interests and behaviors.

59. When a user visits a website using The Trade Desk services, the website utilizes a piece of code provided by the Trade Desk, typically in the form of a JavaScript tag, which allows the website to communicate with The Trade Desk's platform.

60. Upon loading a participating webpage, the code provided by The Trade Desk triggers a request to The Trade Desk's servers, adsrvr.org. The Trade Desk's servers handle the request and set a tracking cookie in the user's browser known as The Trade Desk ID ("TDID").[27] The TDID cookie is a persistent, unique identifier that functions like a digital fingerprint, enabling the Trade Desk to track users across different websites, devices, and browsing sessions.

61. In addition to the TDID cookie, The Trade Desk also collects users' IP addresses,[28] which can provide geolocation data with up to 99% accuracy.[29] By combining IP addresses with TDID cookies, The Trade Desk platform can not only pinpoint a user's geographic location but also distinguish between multiple people using the same household or workplace network, and can even map behavioral patterns as individuals move between home, work, and other locations.

62. The data intercepted by The Trade Desk is not limited to general browsing. Rather, it may also include sensitive health-related information (such as provider searches, appointment scheduling, or specific medical conditions researched) when its tracking code is embedded in healthcare websites. This allows The Trade Desk to build comprehensive profiles of individuals that merge medical interests with broader online behaviors.

---

[27] *See* The Trade Desk, *Privacy and The Trade Desk Platform*, available at https://www.thetradedesk.com/legal/privacy (last visited Jul. 28, 2026).

[28] *See id.*

[29] *See Everything You Need to Know About IP Based Geolocation,* available at https://www.if-so.com/geo-targeting/ (last visited Jul. 30, 2026).

63. The Trade Desk platform then uses the collected data to perform cross-device mapping and behavioral segmentation.[30] This enables advertisers to create granular audience profiles and deliver ads that are tailored to a person's inferred health status, interests, and digital footprint. By adding this information into its vast advertising ecosystem, The Trade Desk can run real-time bidding campaigns where advertisers compete to display targeted ads to users whose profiles reveal a high likelihood of interest in specific services or products.

64. Centralus installed Google DoubleClick and The Trade Desk (and, upon information and good faith belief, other tracking technologies) on many – if not all – of the webpages within its Websites, and it programmed or permitted those webpages to surreptitiously share information communicated by its patients – including their Private Information – with Google, The Trade Desk, and potentially other third parties.

65. Moreover, Centralus used the Private Information and data it collected from patient and non-patient users, including Plaintiffs and Class Members, without their consent, to improve its advertising and bolster its revenues.

### ***C. Centralus's Method of Collecting and Transmitting Plaintiffs' & Class Members' Private Information.***

66. Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (computer, tablet or smartphone) accesses web content through a web browser (*e.g.*, Google's Chrome, Mozilla's Firefox, Apple's Safari and/or Microsoft's Edge browsers).

67. Every website is hosted by a computer "server" that holds the website's contents. The entity(ies) in charge of the website exchange communications with users' devices as their web browsers query the server through the internet.

---

[30] *See* The Trade Desk, *Privacy and The Trade Desk Platform*, *supra* note 27.

68. Web communications consist of Hypertext Transfer Protocol ("HTTP") or Hypertext Transfer Protocol Secure ("HTTPS") requests and HTTP or HTTPS responses, and any given browsing session may consist of thousands of individual HTTP requests and HTTP responses, along with corresponding cookies:

a. **HTTP request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (*i.e.*, web address) and retrieving data from it, GET Requests can also send data to the host server embedded inside the URL and can include cookies. POST Requests, another common type of HTTP Requests, can send a large amount of data outside of the URL. (For instance, uploading a PDF to file a motion to a court.)

b. **HTTP response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP request. HTTP responses may consist of a web page, another kind of file, text information, or error codes, among other data.

c. **Cookies**: a small text file that can be used to store information on the client device that can later be communicated to a server or servers. Typically, cookies are initially sent by a host server along with a HTTP response, instructing the client browser to store data locally. Once stored, cookies then automatically attach to subsequent HTTP requests made to the same website, identifying the client and its preferences. "Third-party cookies" are tracking files that are created by an entirely different website than the one the client is visiting, yet still communicate with that website (*e.g.*, to suggest targeted advertisements).

69. When a User visits the Centralus Websites, the User's web browser sends an HTTP request to Centralus's servers to load the requested web page – *e.g.*, a list of specified medical providers or information about a particular ailment.

70. In response, Centralus's servers send back to the User the requested webpage, which the User is able to view on his or her web browser.

71. This communication exchange also involves the transmission of cookies – first from Centralus's web page, instructing the User's browser to store specific data on the User's

device; and then from the User's device, identifying the User by IP address, device, and/or other identifying information. This exchange of cookies enables Centralus's servers, *e.g.*, to identify the User, to recall the User's preferences and log-in status, and/or to auto-populate the User's log-in information.

72. Unbeknownst to the User, however, his communication with Centralus's Websites also includes the invisible and imperceptible exchange of additional information through the operation of at least two tracking technologies installed and implemented by Centralus: Google's DoubleClick and The Trade Desk.

73. These tracking technologies run silently in the background as a User browses Centralus's Websites, and surreptitiously collect information about the User. The tracking technologies instruct the User's web browser to send the User's IP address, along with other identifying data like device information, browser details, and specific cookies, to Google and The Trade Desk. This identifying information allows those third parties to monitor the User's activity and gather insights about the User's behavior, both on Centralus's Websites and on other, unrelated websites.

74. In other words, when Users visit Centralus's Websites via an HTTP request to Centralus's servers, Centralus's servers send an HTTP response that not only displays the webpage visible to the User, but also contains the invisible tracking technologies which are surreptitiously collecting and transmitting the User's Private Information to Google, The Trade Desk, and/or other third parties – much like a traditional wiretap.

75. Consequently, Centralus is, in essence, handing its patients a tapped phone and, once the webpage is loaded into the patient's browser, the software-based wiretaps are quietly intercepting the patients' communications and Private Information – which are intended only for

Centralus – and transmitting those communications to Google, The Trade Desk, and other third parties.

76. Moreover, as described above, the Google and The Trade Desk tracking technologies place third-party cookies in the web browsers of Users. These cookies uniquely identify the User and are sent with each intercepted communication to ensure that the third party can identify the specific User associated with the information intercepted – in this case, highly sensitive Private Information, like medical providers or treatments sought by the User.

77. On a general, commercial website, such as Amazon, this tracking of users' activity would most likely amount to nothing more than a mere annoyance. On the website of a medical provider like Centralus, however, it is far more serious – and indeed, a violation of applicable law and Users' privacy rights. This is because, through its tracking technologies, Centralus collects its Users' medical and health information – including searches for and views of medical conditions, services, and providers – links that information with other data that can be used to identify the User, and provides the entire "data package" to third-parties Google and The Trade Desk.

78. Stated otherwise, Centralus intentionally configured the tracking technologies installed on its Websites to capture both the "characteristics" of individual patients' communications with Centralus (*i.e.*, the Users' IP addresses, cookie identifiers, device identifiers, and account identifiers) and the "content" of these communications (the buttons, links, pages and tabs they clicked and viewed relating to their health conditions and services sought from Centralus), which includes the Users' protected PHI.

79. Upon information and belief, Centralus intercepted and disclosed the following non-public, Private Information to Google and The Trade Desk:

a. Plaintiffs' and Class Members' status as medical patients, via their

access to the patient Portals and/or clicking to pay a bill online;[31]

b. Plaintiffs' and Class Members' searches for medical providers, medical services or procedures, and medical facilities and locations;

c. Plaintiffs' and Class Members' communications with Centralus through its Websites, including specific text queries typed into the search bar;

d. Plaintiffs' and Class Members' views of Centralus's provider profiles;

e. Plaintiffs' and Class Members' clicks to request an appointment with a Centralus medical provider;

f. Every URL visited by Plaintiffs and Class Members on the Websites; and

g. PII collected by its tracking technologies, including but not limited to patients' locations, accounts, IP addresses, and device identifiers.

80. Centralus also deposits the third-party cookies listed above (*e.g.*, Google's IDE and The Trade Desk's TDID) onto Plaintiffs' and Class Members' computing devices. And without any notice or authorization, Centralus commands Plaintiffs' and Class Members' computing devices to contemporaneously re-direct the Plaintiffs' and Class Members' identifiers and the content of their communications, including their Private Information, to Google and The Trade Desk.

81. The following examples detail how a User may interact with Centralus's Websites, and how Centralus intercepts and shares those interactions – including information and search results related to the Users' private medical conditions and treatment, as well as the Users' identities – with Google and The Trade Desk in real time.

82. For example, a User may visit the Centralus Websites to search for specific medical services. If the User were to click on Cayuga Health and then "Services," she would be shown a

[31] Significantly, accessing the patient Portals and/or paying a bill online would only be performed by existing Centralus patients, which information is considered patient data.

"comprehensive list of services, programs, and departments" offered by Centralus's Cayuga Health subdivision.[32]

83. Clicking on a specific service category – for example, Women's Health – would take the User to the webpage for that category, where she could, *inter alia*, learn more about the various Women's Health services offered by Centralus, "meet the team" of Centralus's medical providers within the field of Women's Health, contact those providers, map their office locations, and view various resources and news articles relating to Women's Health.[33] The User could even "request [an] appointment" with her selected provider from the Women's Health webpage.[34]

84. Unbeknownst to the User, her view of the Women's Health webpage, as well as her selections or "clicks" thereon, are transmitted in real time to Google and The Trade Desk through the tracking technologies Centralus has imbedded in its Websites' code, along with the User's unique identifying third-party cookies mentioned above. *See* Figures 1 and 2, below.

[32] *See* https://centralushealth.org/; https://cayugahealth.org/ (last visited Jul. 30, 2026).

[33] *See* https://cayugahealth.org/services/womens-health/ (last visited Jul. 30, 2026).

[34] *See* https://cayugahealth.org/arrange-an-appointment/ (last visited Jul. 30, 2026).

## Figure 1

**“Women’s Health” Pageview Shared with Google DoubleClick, Along with IDE Cookie**




## Figure 2

**“Women’s Health” Pageview Shared with The Trade Desk, Along with TDID Cookie**




85. Thus, Centralus’s tracking technologies inform Google and The Trade Desk that this individual User, identifiable by her cookies and/or IP address, searched for Women’s Health services.

86. Worse, if the User were to "request [an] appointment" from a medical provider via the Cayuga Health Website, that information also would be transmitted to Google and The Trade Desk via Centralus's tracking technologies, along with the User's identifying cookies. *See* Figures 3 and 4, below.

**Figure 3**

**"Request Appointment" Pageview Shared with Google DoubleClick, Along with IDE Cookie**



**Figure 4**

**"Request Appointment" Pageview Shared with The Trade Desk, Along with TDID Cookie**




87. Similarly, if a User seeking specific medical services were to click on Centralus's Arnot Health website followed by "Services," he would see a list of services provided by the Arnot Health subdivision of Centralus.[35] The User's selection of a particular service, for example "HIV Care,"[36] and his subsequent request to "Make an Appointment"[37] would likewise be transmitted to Google and The Trade Desk via Centralus's tracking technologies, along with the User's identifying cookies and IP address. *See* Figures 5 and 6, below.

---

[35] *See* https://www.arnothealth.org/services (last visited Jul. 30, 2026).

[36] *See* https://www.arnothealth.org/services/hiv-care-clinic (last visited Jul. 30, 2026).

[37] *See* https://www.arnothealth.org/services/hiv-care-clinic#form (last visited Jul. 30, 2026).

**Figure 5**

**"HIV Care Clinic" Pageview Shared with Google DoubleClick, Along with IDE Cookie**




**Figure 6**

**"HIV Care Clinic" Pageview Shared with The Trade Desk, Along with TDID Cookie**




88. Alternatively, a User might visit the Centralus Websites to search for the location of clinics or hospitals operated by Centralus. These User searches are also shared with Google and The Trade Desk without the User's knowledge, along with the User's identifying information.

89. For example, Users' visits to the Cayuga Integrated Behavioral Health webpage[38]

[38] *See* https://cayugahealth.org/hospital/cayuga-behavioral-health/ (last visited Jul. 30, 2026).

from Centralus's Cayuga Health website and the Arnot Ogden Medial Center webpage[39] from Centralus's Arnot Health website are transmitted in real time to third parties Google and The Trade Desk in real time, along with unique identifying third-party cookies. *See* Figures 7-10, below.

**Figure 7**

**"Cayuga Integrated Behavioral Health" Pageview Shared with Google DoubleClick, Along with IDE Cookie**




[39] *See* https://www.arnothealth.org/arnot-ogden-medical-center (last visited Jul. 30, 2026).

## Figure 8

## "Cayuga Integrated Behavioral Health" Pageview Shared with The Trade Desk, Along with TDID Cookie




## Figure 9

## "Arnot Ogden Medical Center" Pageview Shared with Google DoubleClick, Along with IDE Cookie



**Figure 10**

**"Arnot Ogden Medical Center" Pageview Shared with The Trade Desk, Along with TDID Cookie**




90. Additionally, anytime a User clicks the MyChart Patient Portal or "Bill Pay" tab on the Centralus Websites – tabs that only active Centralus patients would use – the User's click is transmitted in real time to Google and The Trade Desk through Centralus's tracking technologies, along with unique identifying third-party cookies. Thus, the tracking technologies inform Google and The Trade Desk that this specific User is a Centralus patient. *See, e.g.*, Figures 11 and 12, below.

**Figure 11**

**User's Click on "MyChart" Shared with The Trade Desk, with TDID Cookie**




**Figure 12**

**User's Click on "Bill Pay" Shared with The Trade Desk, with TDID Cookie**




91. Similarly, if a User uses the general, free-text search bar on Centralus's Cayuga Health or Arnot Health websites, the terms and phrases that the User types – such as "depression" – along with any search results and subsequent "clicks" by the User are transmitted to Google and The Trade Desk, as well as third-party cookies identifying the User, even if those terms, phrases,

and search results contain a User's personal and private medical conditions, treatment or procedures, and/or any queries related thereto. *See, e.g.,* Figures 13-16, below.

## Figure 13

### User's "Depression" Query Shared with Google DoubleClick, with IDE Cookie




## Figure 14

### User's "Depression" Query Shared with The Trade Desk, with TDID Cookie



## Figure 15

### User's View of Article Related to Search Term Shared with Google DoubleClick, with IDE Cookie




## Figure 16

### User's View of Article Shared with The Trade Desk, with TDID Cookie




92. Consequently, the information transmitted to third parties Google and The Trade Desk by the tracking technologies installed on Centralus's Websites includes both information

about Users' medical conditions and treatment *and* their personally identifying information (such as their identifying cookies, IP addresses, physical location, and device information), which together constitute PII/PHI that is protected from disclosure by HIPAA.

93. Upon information and belief, the tracking technologies on Centralus's Websites collect and share with Google and The Trade Desk ***every page a User visits on the Websites***, as well as ***every character typed and every button or link "clicked" thereon***. Thus, Centralus tracks every medical provider viewed by Users, every illness or ailment searched, and every medical service, treatment, or procedure related thereto, and connects such data with the individual User.

94. And each time a User shares this information with Centralus, Centralus in turn shares it with third parties Google and The Trade Desk – along with information that can be used to identify said User – which constitutes an unlawful disclosure of the User's PII/PHI.

95. Plaintiffs and Class Members never consented, agreed, authorized, or otherwise permitted Centralus to disclose their PII/PHI; nor did they authorize any assistance with intercepting their communications. Plaintiffs and Class Members were never provided with any written notice that Centralus disclosed its Websites' Users' PII/PHI, nor were they provided any means of opting out of such disclosures. Despite this, Centralus knowingly disclosed Plaintiffs' and Class Members' PII/PHI to Google and The Trade Desk.

96. By law, Plaintiffs and Class Members are entitled to privacy in their PII/PHI and confidential communications. Centralus deprived Plaintiffs and Class Members of their privacy rights when it: (a) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' confidential communications, PII, and PHI to third parties Google and The Trade Desk; (b) disclosed patients' Protected Information to Google and The Trade Desk – unauthorized third-party eavesdroppers; and (c) undertook this pattern of conduct without

notifying Plaintiffs and Class Members and without obtaining their express written consent. Plaintiffs and Class Members did not discover that Centralus disclosed their PII and PHI to Google and The Trade Desk, and assisted these third parties with intercepting their communications, until at least June 2026 for Plaintiffs Keem-Calhoun and Saygi.

### *D. Centralus's Use of the Tracking Technologies Violated Its Own Privacy Policies.*

97. Centralus publishes several privacy policies that represent to Users of its Websites that Centralus will keep their Private Information private and secure, and that it will not disclose their PII/PHI or will do so only under certain circumstances or with their consent. Through its conduct described herein, Centralus has violated and continues to violate these privacy policies, rendering them false and misleading.

98. First, when Users visit the Cayuga Health Website homepage, they are shown a cookie banner at the bottom of the webpage which states:

> Cayuga Health tracks site traffic & interaction with our ads to better serve our users. This data is not related to any healthcare records within our network. We may share tracking data with our business partners. By continuing to use the site you are acknowledging that you've read this notice. Learn more.[40]

99. The phrase "Learn more" is hyperlinked to an external website, titled "What are cookies?", which explains what cookies are and how are they used, but it does not include any information about the way Centralus's Websites use cookies or for what purposes.[41]

100. Additionally, the cookie banner provides Users with a single option to accept the policy – labeled "Got it" – with no corresponding option to reject or limit Centralus's cookie use.[42]

---

[40] *See* https://cayugahealth.org/ (last visited Jul. 30, 2026). Centralus's two other Websites, https://centralushealth.org/ and https://www.arnothealth.org/, do not present any cookie banner on their homepages. *See id.*

[41] *See* https://www.cookiesandyou.com/ (last visited Jul. 30, 2026).

[42] *See* https://cayugahealth.org/ (last visited Jul. 30, 2026).

101. By presenting this cookie banner, the Cayuga Health website discloses to Users *only* that tracking cookies are used to "better serve" them (*i.e.*, to enhance User experience) and that tracking data "may" be shared with Centralus's (unnamed) business partners. Notably, the banner does ***not*** disclose that Users' sensitive, health-related Private Information – including their PHI, such as their searches for medical services and providers, and their PII – are being tracked, intercepted, and disclosed to third-party advertising and analytics companies like Google and The Trade Desk. Nor does it inform Users that these third parties retain, process, and utilize their PII/PHI for their own tracking and marketing purposes.[43]

102. To the contrary, the banner specifically states that the data tracked and shared by Centralus "is ***not*** related to any healthcare records within our network."[44] This statement is misleading, as it falsely suggests that the data which Centralus is tracking and sharing with third parties does ***not*** include Users' health-related information. In fact, Centralus is disclosing Users' Private Information – including their health-related information – with Google and The Trade Desk, as demonstrated above.

103. The cookie banner further states that, by continuing to use the Website, Users "acknowledg[e]" that they have received notice of Centralus's collection and sharing of their data. However, because the banner's language is inadequate and misleading – in that it does not disclose that the data tracked and shared include Users' PII/PHI – then any purported "consent" obtained through a User's continued browsing, or even by a User clicking "Got It," is ***not*** informed and thus cannot reasonably be construed as adequate consent to such undisclosed tracking and disclosure. At most, the cookie banner merely suggests consent to the Website's tracking and sharing of

[43] *See id.* (emphasis added).

[44] *Id.*

general data – ***not*** to the tracking and sharing of Users' sensitive medical and health-related Private Information to third-party advertising vendors like Google and The Trade Desk.

104. Thus, Users are not given adequate notice or the ability to limit or disable Centralus's data sharing of their PII/PHI with third parties, nor are they ever asked to consent thereto. This absence of a clear and informed choice mechanism is compounded by the banner's vague disclosures, which prevent Users from understanding the scope of Centralus's tracking and data sharing. Additionally, the absence of a direct hyperlink to any privacy policy further obscures the scope and nature of Centralus's data collection and third-party sharing.

105. Second, the privacy policies on Centralus's Websites are similarly false and misleading. While Centralus Health's website does not set forth any privacy policy, Arnot Health's website and Cayuga Health's website present two distinct privacy policies, both of which are equally misleading.

106. Specifically, the privacy policy on the Arnot Health website is misleading and creates false impressions about the website's data practices. For example, the Arnot privacy policy states that it is "committed to keeping secure the data you provide" via the website, that its agents and contractors "are not permitted to use this information for any other purpose than to perform … services for us," and that patient information is handled in accordance with HIPAA protections and confidentiality standards.[45]

107. These representations reasonably lead Users to believe that their sensitive personal and health information is not shared with third parties for independent use, is disclosed only in limited and regulated circumstances, and is otherwise maintained confidentially and secure within the healthcare system. To the contrary, as demonstrated above, Users' Private Information and

[45] *See* https://www.arnothealth.org/privacy (last visited Jul. 30, 2026).

PII/PHI is being transmitted through the Arnot website to third parties Google and The Trade Desk for tracking, analytics, and/or advertising purposes.

108. The privacy policy on the Cayuga Health website similarly conveys a misleading picture of Centralus's data collection and disclosure practices. For example, the Cayuga privacy policy states that it will only provide third parties with "statistical information about our users" that does not identify individual Users, that it "will not, without your express consent, supply your personal information to any third party for the purpose of their … direct marketing," and that personal information is disclosed only as "reasonably necessary" to internal actors such as employees, agents, and service providers.[46]

109. These statements lead reasonable Users to believe that their sensitive, personal Private Information is not shared with third parties in identifiable form, is not disclosed for marketing or advertising purposes without explicit consent, and is otherwise limited to internal or anonymized use. These representations are demonstrably false, as described above, as Users' Private Information and PII/PHI shared with the Cayuga website is consistently shared with third parties Google and The Trade Desk for their own tracking, analytics, and/or advertising purposes.

110. HHS HIPAA Guidance clarifies that any deployment of pixels, cookies, session-replay scripts, or similar technologies on a healthcare website is subject to HIPAA. Even if a provider were to disclose in its privacy policy that it uses such tracking tool – which Centralus does, but falsely states that its cookies are limited to internal and/or anonymous uses – such disclosure alone would not render the provider's disclosure of PHI lawful. Rather, to comply with HIPAA, the provider must: (a) execute a HIPAA-compliant Business Associate Agreement ("BAA") with the tracking vendor, and (b) ensure that any disclosure of PHI is based on a

[46] *See* https://cayugahealth.org/privacy-policy/ (last visited Jul. 30, 2026).

permissible purpose under HIPAA (*e.g.*, for treatment, payment, or healthcare operations) or otherwise obtain the patient's written authorization therefor. Absent both a BAA and an appropriate legal basis, transmitting PHI to a tracking vendor constitutes a HIPAA violation.[47]

111. Centralus does not meet these requirements; in fact, Centralus operates in a **directly contradictory manner**. Although its privacy policies disclose the use of cookies (albeit falsely claiming that its cookies are internal and/or anonymous), Centralus neither (a) notifies Users that their PHI is being disclosed to third parties pursuant to a compliant BAA, nor (b) makes such disclosure for a permissible purpose, but rather for, *e.g.*, marketing/advertising and its own pecuniary gain. Nor does Centralus ever obtain any authorizations from the Users to so disclose their PHI.

112. Instead, Centralus falsely assures Users that their PII/PHI is not being distributed to third parties without their consent, which commitment Centralus plainly does not honor.

113. Centralus's failure to disclose its actual practices to its Users, coupled with the express denials in its privacy policies, further exacerbates Centralus's failure to comply with HIPAA, as Centralus not only withholds essential information from its Users (*i.e.*, Centralus patients, including Plaintiffs and the Classes), but also affirmatively misleads them into believing that no such disclosures to third parties exist. Indeed, there is no indication that Centralus has ever executed a BAA with Google or The Trade Desk, nor has it obtained any HIPAA-compliant authorizations from its Users – and specifically not from Plaintiffs – to permit such disclosures for non-treatment purposes. Instead, Centralus falsely creates the impression that no such authorizations are necessary.

---

[47] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html#:~:text=BAA%20is%20required.-,Tracking%20on%20unauthenticated%20webpages,a%20disclosure%20of%20PHI%20and%20is%20subject%20to%20the%20HIPAA%20Rules.,-Tracking%20within%20mobile (last visited Jul. 30, 2026).

114. Accordingly, Centralus breached its own privacy policies by unlawfully intercepting and disclosing Users' Private Information to Google and The Trade Desk (and likely to other third parties) without obtaining the Users' consent or authorization. These practices amount to a clear violation of HIPAA's requirements governing the use, disclosure, and consent related to PII and PHI, and constitute, *inter alia*, deceptive trade practices and a breach of Centralus's contracts with and duties to Plaintiffs and the Classes.

***E. Centralus Violated HIPAA.***

115. Centralus's disclosure of Plaintiffs' and Class Members' Private Information to third party entities like Google and The Trade Desk violated HIPAA.

116. Under federal law, a healthcare provider may not disclose PHI or related PII about a patient, potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[48]

117. HIPAA's Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (a) "created or received by a health care provider;" (b) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

118. The Privacy Rule broadly defines protected health information as individually identifiable health information that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

---

[48] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

119. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (a) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'" or (b) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

A. Names;
…
H. Medical record numbers;
…
J. Account numbers;
…
M. Device identifiers and serial numbers;
N. Web Universal Resource Locators (URLs);
O. Internet Protocol (IP) address numbers; … and
P. Any other unique identifying number, characteristic, or code… and" the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."[49]

120. The HIPAA Privacy Rule requires any "covered entity" – which term includes health care providers such as Centralus – to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

121. Even the fact that an individual is receiving a medical service or is a patient of a particular entity can be PHI.

122. Indeed, HHS has instructed health care providers that, while identifying information alone is not necessarily protected PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health

---

[49] *See* 45 C.F.R. § 160.514.

condition, health care provision or payment data, **such as an indication that the individual was treated at a certain clinic**, then this information would be PHI."[50]

123. Consistent with this restriction, HHS has issued marketing guidance that provides, "With limited exceptions, **the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing**. … Simply put, **a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes.** Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[51]

124. As detailed above, Centralus provided PII/PHI to third parties in violation of the Privacy Rule, as well as in violation of its own privacy policies. An individual or corporation violates the HIPAA Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual."

125. The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information … if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320(d)(6).

126. Violation of 42 U.S.C. § 1320(d)(6) is subject to criminal penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320(d)(6)(b). In such

[50] *See Guidance Regarding Methods for De-Identification of Protected Health Information*, *supra* note 9.

[51] *Marketing*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Jul. 30, 2026).

cases, an entity that knowingly obtains individually identifiable health information relating to an individual "shall be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320(d)(6)(b)(1).

127. HIPAA also requires Centralus to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights," 45 C.F.R. § 164.312(a)(1) – all of which Centralus failed to do.

128. Centralus violated HIPAA by disclosing the PII/PHI of its patients to third parties Google and The Trade Desk for marketing purposes and without the patients' express written authorization. *See* HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.501; 164.508(a)(3), 164.514(b)(2)(i).

129. When Users visit Centralus's Websites, they may, *e.g.*, search for medical services, select care centers and providers, request appointments, enter the patient Portals, and pay medical bills, among other things. This information, when combined with identifiers and cookies collected by the Google DoubleClick and The Trade Desk tracking technologies installed by Centralus on its Websites – which collect device identifiers, IP addresses, and URLs and associate them with the User's medical information – qualifies as protected PII/PHI because it is (1) individually identifiable and (2) relates to the patient's health status. By sharing this information with third parties like Google and The Trade Desk without adequately informing Users or obtaining their consent to do so, Centralus has violated HIPAA.

130. For example, when a User visits Centralus's Websites, DoubleClick's cookies and

the associated script embed persistent, unique identifiers in the User's browser and transmit them to Google with page-level data. Under 45 CFR §§ 160.103 and 164.514, such "unique identifying number[s], characteristic[s], or code[s]" (including cookies and device IDs) qualify as identifiers. When those identifiers travel in the same payload as the Users' medical service needs, care center selections, or status as a patient of Centralus (as evidenced by the User entering the patient Portal or attempting to pay a bill), the combined dataset becomes protected PII/PHI because the identifiers can be used by third parties to single out the specific User whose health data is implicated. When Centralus allows such information to be transmitted to Goole via DoubleClick, it results in a HIPAA violation.[52]

131. Centralus further failed to comply with other HIPAA safeguard regulations as follows:

a) Failing to ensure the confidentiality and integrity of electronic PII/PHI that Centralus created, received, maintained and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b) Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

c) Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Centralus in violation of 45 C.F.R. § 164.308(a)(6)(ii);

d) Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

e) Failing to protect against reasonably anticipated uses or disclosures of electronic PII/PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3), and

f) Failing to design, implement and enforce policies and procedures that

[52] *See Kane v. University of Rochester*, 2024 WL 1178340, 2024 U.S. Dist. LEXIS 48515 (W.D.N.Y. Mar. 19, 2024) (possibility of matching of health data with personal identifiers can effect a HIPAA violation and satisfy the ECPA crime-tort exception).

would establish physical and administrative safeguards to reasonably safeguard PII/PHI in violation of 45 C.F.R. § 164.530(c).

132. In disclosing the content of Plaintiffs and the Class Members' communications, Centralus's conduct was tortious, criminal, and designed to violate federal and state constitutional and statutory provisions.

133. Commenting on a June 2022 report discussing the use of tracking technology by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[53]

134. Centralus's placing third-party tracking codes on its Websites is a violation of Plaintiffs' and Class Members' privacy rights under federal and state law. While Plaintiffs do not bring a claim under HIPAA itself, Centralus's HIPAA violations demonstrate Centralus's wrongdoing relevant to other claims and establishes its duty to maintain patient privacy.

***F. Centralus's Use of Tracking Technologies Violates OCR Guidance.***

135. The federal government has issued guidance warning that tracking technologies like those used by Centralus may violate federal privacy law when installed on healthcare websites.

136. Healthcare organizations regulated under HIPAA may use third-party tracking tools *only in a limited way*, to perform analysis on data key to their own operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to third parties.[54]

137. According to the OCR Bulletin, Centralus has violated HIPAA rules by

---

[53] ADVISORY BOARD, '*Deeply Troubled'*: *Security experts worry about Facebook trackers on hospital sites*, available at https://www.advisory.com/daily-briefing/2022/06/17/data-trackers (last visited Jul. 30, 2026).

[54] *See* OCR Bulletin, *supra,* note 8.

implementing the tracking technologies detailed herein.[55]

138. Centralus has shared Plaintiffs' and Class Members' Private Information, including but not limited to their health conditions, medical providers, treatments and/or medications sought, the frequency with which they take steps to obtain healthcare for certain conditions, and their unique personal identifiers. This information is, as described in the OCR Bulletin, "highly sensitive."

139. The OCR Bulletin makes clear how broad the government's view of protected information is, as it explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, ***or any unique identifying code***.[56]

140. And when a User's PHI is or can be connected with information that can identify the User, the OCR Bulletin makes clear that any and all such information is protected by HIPAA and ***cannot*** be disclosed without the User's consent:

> If an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, **the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that web page is a disclosure of PHI** to the extent that the information is both identifiable and related to the individual's health or future health care.[57]

141. As detailed herein, this is exactly what Centralus is doing with its Users' data.

142. Centralus's collection and sharing of Users' Private Information – which included both their PII and PHI – with third parties such as Google and The Trade Desk violated Plaintiffs'

---

[55] *See id*. ("disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures").

[56] *Id.* (emphasis added).

[57] *Id.* (emphasis added).

and Class Members' rights under applicable law.

### *G. Centralus Violated Industry Standards.*

143. A medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship – indeed, it is a cardinal rule.

144. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

145. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a ***core value*** in health care. … Patient privacy encompasses a number of aspects, including … personal data (informational privacy)[.][58]

146. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of a patient is confidential. **Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services.** ***Disclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship.*** Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity) about the purpose(s) for which access would be granted.[59]

147. AMA Code of Medical Ethics Opinion 3.3.2 provides:

> Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically … must: (c) Release patient information only in keeping with ethics guidelines for

---

[58] *Available at* https://code-medical-ethics.ama-assn.org/ethics-opinions/privacy-health-care (emphasis added) (last visited Jul. 30, 2026).

[59] *Available at* https://code-medical-ethics.ama-assn.org/ethics-opinions/access-medical-records-data-collection-companies (emphasis added) (last visited Jul. 30, 2026).

confidentiality and privacy.[60]

148. Centralus's use of the tracking technologies described herein also violates FTC data security guidelines. The FTC has promulgated numerous guides for businesses, which highlight the importance of implementing reasonable data security practices.

149. The FTC's October 2016 publication *Protecting Personal Information: A Guide for Business*[61] established cyber-security guidelines for businesses. These guidelines provide, *inter alia*, that businesses should protect the personal patient information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network vulnerabilities, and implement policies to correct any security problems.

150. In fact, in past years the FTC has brought enforcement actions against several healthcare companies, including Premom, BetterHelp, GoodRx, and Flow Health, for conveying information – or enabling an inference – about their consumers' health to unauthorized third parties without the consumers' consent.

151. Like the health care companies fined by the FTC in recent years, Centralus failed to implement these basic, industry-wide data security practices, and in doing so violated applicable law and the rights of Plaintiffs and Class Members.

***H. Centralus Violated New York Standards.***

152. New York State has long been a national leader in protecting the confidentiality of personal medical information, and it has established strict privacy standards for medical records.

---

[60] *Available at* https://code-medical-ethics.ama-assn.org/ethics-opinions/confidentiality-electronic-medical-records (last visited Jul. 30, 2026).

[61] *Available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Jul. 30, 2026).

153. Specifically, New York requires patient consent before a physician can disclose an individual's medical information to another treating physician, and it limits such disclosure to immediately relevant information. *See* N.Y. Public Health Law § 18(6).

154. Even stronger protections restrict the release of certain particularly sensitive information regarding genetic tests, mental health, medical treatment of adolescents, sexually transmitted infections, and HIV.[62]

155. Moreover, New York Department of Health regulations governing hospitals impose significant privacy and security standards relating to medical records, patient rights, and medical staff by-laws.

156. With respect to medical records, a hospital must ensure the confidentiality of patient records and release records or information from records "only to hospital staff involved in treating the patient and individuals as permitted by Federal and State laws." 10 NYCRR § 405.10 (a)(6).

157. This provision has been interpreted to require hospitals to obtain consent from the patient before disclosing medical records to an outside entity, even for treatment or reimbursement purposes.[63]

158. A hospital must also institute safeguards to protect the security of medical records, including a system "to ensure the integrity of the authentication and protect the security of all transmissions, records and record entries" as well as implement policies to ensure the security of

---

[62] *See, e.g.,* N.Y. Civil Rights Law § 79-l (genetic health); N.Y. Civil Rights Law § 79-j (mental health); New York Public Health Law § 18(1)(e) (mental health); Mental Hygiene Law § 33.13 (mental health); NY eHealth Collaborative Privacy & Security Minor Consent Tiger Team, *Barriers to the Exchange of Pediatric Health Information*, pp. 7-8 (July 2, 2010) (describing numerous state law provisions and state and federal case law that create confidentiality rights for minors seeking health care on their own); N.Y. Public Health Law Chap. 45, § 2306 (sexually transmitted infections); N.Y. Public Health Law Chap. 45, Art. 27-F (HIV).

[63] *See Williams v. Roosevelt Hospital*, 66 N.Y.2d 391 (1985).

electronic or computer equipment from unwarranted access. 10 NYCRR § 405.10 (a)(2).

159. Accordingly, Centralus's decision to utilize tracking technologies which disclose Users' Private Information without their consent violated New York standards as well.

### *I. Users' Reasonable Expectation of Privacy.*

160. Plaintiffs and Class Members were aware of Centralus's duty of confidentiality when they sought medical services from Centralus.

161. Indeed, when Plaintiffs and Class Members provided their PII/PHI to Centralus, they each had a reasonable expectation that the information would remain private, and that Centralus would not share their Private Information with third parties for a commercial purpose unrelated to patient care.

162. Had Plaintiffs and Class Members known that Centralus would share their Private Information with third parties such as Google and The Trade Desk, they never would have used Centralus's Websites nor shared their Private Information thereon, or would have acted differently.

163. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

164. For example, a Consumer Reports study shows that 92% of Americans believe that Internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[64]

165. Personal data privacy and obtaining consent to share Private Information are

---

[64] Consumer Reports, *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds* (May 11, 2017), available at https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/ (last visited Jul. 30, 2026).

material to Plaintiffs and Class Members.

166. Plaintiffs' and Class Members' reasonable expectations of privacy in their PII/PHI are grounded in, among other things, Centralus's status as a healthcare provider, Centralus's statutory and common law obligation to maintain the confidentiality of patients' PII/PHI, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Centralus's express and implied promises of confidentiality.

167. Centralus's use of tracking technologies on its Websites, which led to the unauthorized disclosure of Users' Private Information without their consent, violated the Users' expectation of privacy.

***J. Unique Personal Identifiers Are Protected Health Information.***

168. As described above, HIPAA sets forth policies designed to protect the privacy and confidentiality of all individually identifiable health information that is held or transmitted by a covered entity.

169. While not all health or personal data is covered under HIPAA, the law specifically applies to health information that is or can be directly associated with an individual (PHI) and that is held by healthcare providers, health insurance providers, and healthcare data clearinghouses.[65]

170. Additionally, HIPAA lists approximately eighteen (18) "identifiers" which either

[65] *See* Alfred Ng & Simon Fondrie-Teitler, *This Children's Hospital Network Was Giving Kids' Information to Facebook* (June 21, 2022), available at https://themarkup.org/pixel-hunt/2022/06/21/this-childrens-hospital-network-was-giving-kids-information-to-facebook (stating that "[w]hen you are going to a covered entity's website, and you're entering information related to scheduling an appointment, including your actual name, and potentially other identifying characteristics related to your medical condition, there's a strong possibility that HIPAA is going to apply in those situations") (last visited Jul. 30, 2026).

identify or can be used to identify, contact, or locate an individual, alone or in combination with other sources. These identifiers, which include names, geographic information (street address, city, county, and zip code), dates related to an individual, email addresses, device identifiers, web URLs, and IP addresses, are considered PII and are protected by HIPAA if they are or can be linked to an individual's health-related data.[66]

171. As described above, the information disclosed to Google and The Trade Desk (and potentially to other third parties) by Centralus included not only its Users' generic medical information – *e.g.*, the medical services and providers they sought and selected, their status as a Centralus patient, the medical conditions they researched, and the medical advice they sought, among other things – but also a number of HIPAA identifiers connected therewith – *e.g.*, their names, geographic information, email addresses, dates they sought treatment, telephone numbers, computer IP addresses, device identifiers, and web URLs visited.

172. Because this information was produced together and connects (or can be used to connect), for example, the treatment sought with the individual User who sought the treatment, it is ***all*** protected by HIPAA and cannot be disclosed without the Users' consent. *See* 45 C.F.R. § 164.514(2)(ii) (information is protected as personally identifiable when it "could be used alone or in combination with other information to identify an individual who is a subject of the information").

173. Consequently, Centralus's disclosure of Plaintiffs' and Class Members' PII in connection with their PHI also violated HIPAA and industry-wide privacy standards.

### *K. Centralus Was Enriched & Benefitted From Its Use of Tracking Technologies.*

174. One of the primary reasons that Centralus decided to embed tracking technologies

[66] *Guidance Regarding Methods for De-identification of Protected Health Information*, *supra* note 9.

on its Websites was to improve marketing by creating targeted advertising campaigns that maximize conversions and thereby decrease costs to Centralus and boost its revenues.

175. This process works as follows. The tracking technologies installed by Centralus on its Websites, specifically Google DoubleClick and The Trade Desk, collect and share with Google and The Trade Desk information communicated to Centralus by Users via the Centralus Websites, including the Users' PII/PHI. Google and The Trade Desk analyze this information for specific data points, such as how Users interact with the Websites and which Website features are most frequently used. Google and The Trade Desk then share their analyses with Centralus, which provide Centralus with certain commercial benefits, including permitting Centralus to optimize the functionality of its Websites.

176. Centralus also receives additional commercial benefits from using these third-party tracking technologies, such as being able to serve targeted advertisements to existing and prospective patients through a process known as "retargeting."

177. Retargeting is a form of online marketing that targets Users with ads based on their previous Internet communications and interactions. Retargeting operates by tracking Users' web activity via tracking code and cookies and placing targeted ads on other websites which Users may visit later.[67]

178. Here, for example, if a User were to search for and click on a specific doctor or medical condition on Centralus's Websites, that information is sent to Google and The Trade Desk, which can then target that User with ads about that doctor or condition for Centralus's benefit. Google and The Trade Desk can also target the User with ads about another doctor or medication

[67] Medico Digital Insights, *The complex world of healthcare retargeting,* available at https://www.medicodigital.com/the-complicated-world-of-healthcare-retargeting/ (last visited Jul. 10, 2026).

that can treat the condition, who potentially has paid Google and/or The Trade Desk to place such a targeted ad. Google and The Trade Desk can also use its data on the User to find more individuals with traits similar to the User, and who are thus more likely to use Centralus – or another sponsored facility, doctor, or medication – in a similar manner, and target those new individuals with customized, targeted ads.[68]

179. Through this process, the tracking technologies used by Centralus load and capture as much data as possible whenever a User loads and browses the Centralus Websites. The information the tracking technologies capture "includes URL names of pages visited, and actions taken – all of which could be potential examples of health information."[69]

180. Plaintiffs' and Class Members' Private Information has considerable value as highly monetizable data, especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

181. In exchange for disclosing the Private Information of their account holders and patients, Centralus is compensated by Google and The Trade Desk in the form of enhanced advertising services and more cost-efficient marketing on its platform.

182. Thus, utilizing the tracking technologies commercially benefitted Centralus by, among other things, helping it to optimize its Websites and reducing its cost of advertising via retargeting.

183. But companies have started to warn about the potential HIPAA violations associated with using tracking technologies because many such trackers are not HIPAA-compliant

---

[68] *See, e.g.*, *How to Make Facebook Ads HIPAA Compliant and Still Get Conversion Tracking* (Mar. 14, 2023), available at https://www.freshpaint.io/blog/how-to-make-facebook-ads-hipaa-compliant-and-still-get-conversion-tracking (last visited Jul. 30, 2026).

[69] *Id.*

or are only HIPAA-compliant if certain steps are taken.[70]

184. For example, Medico Digital warns that "retargeting requires sensitivity, logic and intricate handling. When done well, it can be a highly effective digital marketing tool. But when done badly, it could have serious consequences."[71]

185. Centralus retargeted patients and potential patients, including Plaintiffs and Class Members, using the tracking technologies described herein. As set forth above, however, Centralus's tracking practices failed to comply with HIPAA.

***L. Plaintiffs' and Class Members' Private Information is Extremely Valuable.***

186. Plaintiffs' and Class Members' Private Information had value, and Centralus's unlawful interception and disclosure thereof harmed Plaintiffs and the Classes by not compensating them for the value of their Private Information and, in turn, decreasing the value of their Private Information.

187. Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which information they use to serve their own purposes, including potentially micro-targeting advertisements to people with certain health conditions.

188. The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the tech economy.

189. The market for Internet user data has been analogized to the "oil" of the tech

[70] *See The guide to HIPAA compliance in analytics,* available at https://campaign.piwik.pro/wp-content/uploads/2023/10/The-guide-to-HIPAA-compliance-in-analytics.pdf (explaining that Google Analytics 4 is not HIPAA-compliant) (last visited Jul. 30, 2026).

[71] *The complex world of healthcare retargeting, supra* note 67.

industry.[72] A 2015 article from TechCrunch accurately noted that "data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[73] That article noted that the value of a single Internet user – or really, a single user's data – varied from about $15 to more than $40.

190. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data (after costs).[74] That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

191. Professor Paul M. Schwartz, writing in the Harvard Law Review, notes: "Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information."[75]

192. This economic value has been leveraged largely by corporations who pioneered the methods of its extraction, analysis, and use. However, the data also has economic value to Internet users. Market exchanges have sprung up where individual users like Plaintiffs herein can sell or monetize their own data. Indeed, numerous companies, such as PermissionResearch and Smart Panel, **will pay Internet users cash money for their data**.[76]

---

[72] *See* https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last visited Jul. 30, 2026).

[73] *See* https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/ (last visited Jul. 30, 2026).

[74] *See* Robert J. Shapiro, *What Your Data is Really Worth to Facebook* (Jul. 12, 2019), https://washingtonmonthly.com/2019/07/12/what-your-data-is-really-worth-to-facebook/ (last visited Jul. 30, 2026).

[75] Paul M. Schwartz, *Property, Privacy, and Personal Data*, 117 Harv. L. Rev. 2055, 2056-57 (2004).

[76] *See* Kevin Mercandante, *10 Apps for Selling Your Data for Cash*, https://wallethacks.com/apps-for-selling-your-data/ (last visited Jul. 30, 2026).

193. There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

194. Courts have recognized the value of personal information and the harm when it is disclosed without consent. *See, e.g., In re Facebook Privacy Litig.*, 572 F. App'x 494, 494 (9th Cir. 2014) (holding that plaintiffs' allegations that they were harmed by the dissemination of their personal information and by losing the sales value of that information were sufficient to show damages for their breach of contract and fraud claims); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) (recognizing "the value that personal identifying information has in our increasingly digital economy").

195. Healthcare data is particularly valuable on the black market because it often contains both an individual's PII and medical conditions, as opposed to a single piece of information that may be found in a financial breach.

196. Moreover, unlike a stolen credit card that can be canceled, most people are unaware that their medical information has been stolen and sold. Even once detected, it can take years to undo the damage caused.

197. The value of health data is well-known and various reports have been conducted to identify its value.

198. Specifically, in 2023, the Value Examiner published a report entitled Valuing Healthcare Data. The report focused on the rise in providers, software firms, and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such

data should ensure it is priced at fair market value to mitigate any regulatory risk."[77]

199. Trustwave Global Security published a report entitled The Value of Data. With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[78]

200. The value of health data has also been reported extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[79]

201. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[80]

202. The dramatic difference in the price of healthcare data compared to other forms of private information commonly sold is evidence of the value of PHI.

203. Moreover, these rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other Internet users' stolen data, surely Internet users can sell their own data.

204. In short, there is a quantifiable economic value to Internet users' data, including Plaintiffs' and Class Members', that is greater than zero. The exact value of that information in

---

[77] *Available at* https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf (last visited Jul. 30, 2026).

[78] *See* https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (last visited Jul. 30, 2026) (citing https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf).

[79] *Available at* https://time.com/4588104/medical-data-industry/ (last visited Jul. 30, 2026).

[80] *Available at* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited Jul. 30, 2026).

this case will be a matter for experts to determine in the course of discovery.

205. Here, however, Centralus simply traded away – or effectively sold, for its own gain – Plaintiffs' and Class Members' communications and transactions via its Websites to third-party advertisers, without their permission.

206. The unauthorized access to Plaintiffs' and Class Members' personal and Private Information has diminished the value of that information, resulting in harm to Users of Centralus's Websites, including Plaintiffs and Class Members.

207. Plaintiffs have a continuing interest in ensuring that their future communications with Centralus are protected and safeguarded from future unauthorized disclosure.

## REPRESENTATIVE PLAINTIFFS' EXPERIENCES

### *A. Plaintiff Bethanie Keem-Calhoun*

208. Plaintiff Bethanie Keem-Calhoun is a current patient of Centralus. Prior to its formation, Plaintiff Keem-Calhoun was a patient of both Arnot Health and Cayuga Health systems for many years.

209. As a patient, Plaintiff Keem-Calhoun has used, and continues to use, the Centralus Websites and patient portals via her phone and computer, *inter alia*, to search for and receive healthcare services from Centralus, at Centralus's direction. Prior to the creation of the Centralus website and patient portal in 2024, Plaintiff Keem-Calhoun used the Arnot Health and Cayuga Health websites and patient portals via her phone and computer, also to search for and receive healthcare services from those providers at their direction.

210. As a condition of receiving these healthcare services, Plaintiff Keem-Calhoun disclosed her Private Information to Centralus beginning in 2024 and as recently as June 2026.

211. Plaintiff Keem-Calhoun logged onto the Centralus patient portals; scheduled and viewed appointments with her providers via the portals; viewed her medical records, test results,

and bills; paid medical bills; and/or communicated with her providers via the portals.

212. Plaintiff Keem-Calhoun also searched for medical providers and office locations and contact information on the Websites, and she searched for information and treatment options for various medical conditions from which she suffers.[81]

213. In so doing, Plaintiff Keem-Calhoun disclosed to Centralus information about her specific medical conditions, providers, location, patient status, and the treatments she sought via Centralus's Websites.

214. Plaintiff Keem-Calhoun has used and continues to use the same devices throughout the relevant time period in this case. Plaintiff Keem-Calhoun also has used, and continues to use, these devices to access her active Google account.

215. Plaintiff Keem-Calhoun reasonably expected that her communications with Centralus via its Websites were confidential, solely between herself and Centralus, and that such communications would not be transmitted to or intercepted by a third party.

216. Plaintiff Keem-Calhoun provided her Private Information to Centralus and trusted that the information would be safeguarded according to Centralus's policies and state and federal law.

217. As described herein, Centralus worked along with Google and The Trade Desk to intercept Plaintiff Keem-Calhoun's communications with Centralus's Websites, including those that contained and/or constituted her confidential Private Information and PII/PHI.

218. Centralus willfully facilitated these interceptions without Plaintiff Keem-Calhoun's knowledge, consent, or express written authorization.

---

[81] The names of Plaintiffs' medical providers, as well as their specific medical conditions and treatments, have been withheld in an effort to protect Plaintiffs' privacy and the additional disclosure of their Private Information.

219. Centralus transmitted to Google and The Trade Desk Plaintiff Keem-Calhoun's computer IP address, device identifiers, physical location, and patient status, in conjunction with information such as her medical services, treatments, providers, and office locations sought and selected, appointment types, and various searches and button/menu selections.

220. By doing so without her consent, Centralus breached Plaintiff Keem-Calhoun's right to privacy and unlawfully disclosed her Private Information.

221. Centralus did not inform Plaintiff Keem-Calhoun that it had shared her Private Information with Google and/or The Trade Desk.

222. After disclosing her private medical information to Centralus, Plaintiff Keem-Calhoun began receiving targeted ads on her web browser relating to Centralus and/or her medical conditions, providers, and treatment. Plaintiff has also received targeted ads promoting alternative treatments for certain medical conditions from which she suffers, and attempting to dissuade her from obtaining medical treatments which were recommended by her providers.

223. Plaintiff Keem-Calhoun suffered damages in the form of, *inter alia*, (a) invasion of privacy; (b) violation of confidentiality of her Private Information; (c) loss of benefit of the bargain; (d) diminution of value of the Private Information; (e) statutory damages; and (f) the continued and ongoing risk to her Private Information.

224. Plaintiff Keem-Calhoun has a continuing interest in ensuring that her Private Information is protected and safeguarded from future unauthorized disclosure.

225. In connection with her ongoing medical care, Plaintiff Keem-Calhoun continues to use Centralus's Websites and patient portals, and she will need to do so in the future. Plaintiff Keem-Calhoun has an interest in ensuring that her Private Information communicated to Centralus's Websites in the future is also protected and safeguarded from unauthorized disclosure.

***B. Plaintiff Amanda Saygi***

226. Plaintiff Amanda Saygi is a current patient of Centralus. Prior to its formation, Plaintiff Saygi was a patient of the Arnot Health and/or Cayuga Health systems.

227. As a patient and patient proxy, Plaintiff Saygi has used, and continues to use, the Centralus Websites and patient portals via her phone and computer, *inter alia*, to search for and receive healthcare services from Centralus, at Centralus's direction. Prior to the creation of the Centralus website and patient portal in 2024, Plaintiff Saygi used the Arnot Health and/or Cayuga Health websites and patient portals via her phone and computer, also to search for and receive healthcare services from those providers at their direction.

228. As a condition of receiving these healthcare services, Plaintiff Saygi disclosed her Private Information to Centralus beginning in 2024 and as recently as June 2026.

229. Plaintiff Saygi logged onto the Centralus patient portals; scheduled and viewed appointments with her providers via the portals; viewed her medical records, test results, and bills; paid medical bills; and/or communicated with her providers via the portals.

230. Plaintiff Saygi also searched for medical providers and office locations and contact information on the Websites, and she searched for information and treatment options for medical conditions from which she suffers.

231. In so doing, Plaintiff Saygi disclosed to Centralus information about her specific medical conditions, providers, location, patient status, and the treatments she sought via Centralus's Websites.

232. Plaintiff Saygi has used and continues to use the same devices throughout the relevant time period in this case. Plaintiff Saygi also has used, and continues to use, these devices to access her active Google account.

233. Plaintiff Saygi reasonably expected that her communications with Centralus via the Websites were confidential, solely between herself and Centralus, and that such communications would not be transmitted to or intercepted by a third party.

234. Plaintiff Saygi provided her Private Information to Centralus and trusted that the information would be safeguarded according to Centralus's policies and state and federal law.

235. As described herein, Centralus worked along with Google and The Trade Desk to intercept Plaintiff Saygi's communications with Centralus's Websites, including those that contained confidential Private Information and PII/PHI.

236. Centralus willfully facilitated these interceptions without Plaintiff Saygi's knowledge, consent, or express written authorization.

237. Centralus transmitted to Google and The Trade Desk Plaintiff Saygi's computer IP address, device identifiers, physical location, and patient status, in conjunction with information such as her medical services, treatments, providers, and office locations sought and selected, appointment types, and various searches and button/menu selections.

238. By doing so without her consent, Centralus breached Plaintiff Saygi's right to privacy and unlawfully disclosed her Private Information.

239. Centralus never informed Plaintiff Saygi that it had shared her Private Information with Google and/or The Trade Desk.

240. After disclosing her private medical information to Centralus, Plaintiff Saygi began receiving targeted ads on her web browser relating to Centralus and/or her medical conditions, providers, and treatment. Plaintiff has also received targeted ads specifically relating to medical conditions and/or treatments which she searched or viewed on the Centralus websites.

241. Plaintiff Saygi suffered damages in the form of, *inter alia*, (a) invasion of privacy;

(b) violation of confidentiality of her Private Information; (c) loss of benefit of the bargain; (d) diminution of value of her Private Information; (e) statutory damages; and (f) the continued and ongoing risk to her Private Information.

242. Plaintiff Saygi has a continuing interest in ensuring that her Private Information is protected and safeguarded from future unauthorized disclosure.

243. In connection with her ongoing medical care, Plaintiff Saygi continues to use Centralus's Websites and patient portal, and she will need to do so in the future. Plaintiff Saygi has an interest in ensuring that her Private Information communicated to Centralus's Websites in the future is also protected and safeguarded from unauthorized disclosure.

## TOLLING

244. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiffs and Class Members did not know, and had no way of knowing, that their Private Information was intercepted and unlawfully disclosed because Centralus kept this information secret.

## CLASS ACTION ALLEGATIONS

245. Plaintiffs bring this action on behalf of themselves and all other persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure.

246. Plaintiffs seek certification of a class (the "Class" and each member thereof, a "Class Member") defined as follows:

> **All Centralus patients who visited Centralus's Websites within the applicable limitations period and whose Private Information was disclosed to a third party without their authorization or consent.**

247. Plaintiffs also seek certification of a subclass defined as follows:

> **All Centralus patients who visited Centralus's Websites and performed one of the following actions thereon:**

- **Searched for or viewed medical providers;**
- **Searched for or viewed medical facilities or locations;**
- **Searched for or viewed medical services or procedures;**
- **Accessed the patient portals;**
- **Clicked to pay a bill online;**
- **Clicked to request an appointment; and/or**
- **Typed a search query into the Websites' search bar.**

248. The class and subclass are collectively referred to herein as the "Classes." Excluded from the Classes are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign and any Judge who adjudicates this case, including their staff and immediate family.

249. Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

250. **Numerosity.** The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are over 50,000 individuals whose PII and PHI were improperly disclosed to third parties by Defendant, and the Classes are identifiable within Defendant's records. The vast majority of the Class Members are believed to be New York residents.

251. **Commonality & Predominance.** Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a. Whether and to what extent Defendant had a duty to protect Plaintiffs' and Class Members' Private Information;

b. Whether Defendant had a duty not to disclose Plaintiffs' and Class Members' Private Information to unauthorized third parties;

c. Whether Defendant violated legal standards by disclosing Plaintiffs' and Class Members' Private Information to Google, The Trade Desk, or other third parties;

d. Whether Defendant violated its privacy policy by disclosing Plaintiffs' and Class Members' Private Information to Google, The Trade Desk, or other third parties;

e. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

f. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been disclosed and/or compromised;

g. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

h. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiffs' and Class Members' Private Information;

i. Whether Defendant violated the consumer protection statutes invoked herein;

j. Whether Defendant knowingly made false representations as to its data security and/or privacy policy practices;

k. Whether Defendant knowingly omitted material facts with respect to its data security and/or privacy policy practices;

l. Whether Defendant's acts and practices violated Plaintiffs' and Class Members' privacy rights;

m. Whether Plaintiffs and Class Members are entitled to actual, consequential, statutory, or nominal damages as a result of Defendant's wrongful conduct;

n. Whether Defendant knowingly made false representations as to its data security and/or privacy policy practices; and

o. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

252. **Typicality.** Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised and disclosed to third parties as a result of Defendant's use of the tracking technologies, due to Defendant's misfeasance.

253. **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other members of the Classes. Plaintiffs seek no relief that is antagonistic or adverse to the members of the Classes, and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

254. **Superiority and Manageability.** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a defendant with significant resources like Centralus. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

255. **Policies Generally Applicable to the Classes.** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with

respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs.

256. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class member with its superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by the Classes and will establish the right of each Class member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

257. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

258. **Ascertainability & Notice.** Membership in the Classes can be determined by objective records maintained by Defendant, and adequate notice can be given to Class Members directly using information maintained in Defendant's records.

259. **Class-wide Injunctive Relief.** Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth herein.

260. Defendant has acted or refused to act on grounds generally applicable to the Classes

and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

261. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information;

b. Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information with respect to Defendant's privacy policy;

c. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using and safeguarding their Private Information;

d. Whether Defendant failed to comply with its own policies, applicable laws, regulations and industry standards relating to data security;

e. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

g. Whether Class Members are entitled to actual, consequential, statutory, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**NEW YORK LAW SHOULD APPLY TO PLAINTIFFS & THE CLASSES AS A WHOLE**

262. The State of New York has a significant interest in regulating the conduct of businesses operating within its borders.

263. New York, which seeks to protect the rights and interests of New York and all

residents and citizens of the United States against a company headquartered and doing business in New York, has a greater interest in the claims of Plaintiffs and the Classes than any other state and is most intimately concerned with the claims and outcome of this litigation.

264. The principal place of business and headquarters of Centralus, located at 101 Dates Drive, Ithaca, New York 14850, is the "nerve center" of its business activities – the place where its high-level officers direct, control, and coordinate Defendant's activities, including major policy decisions.

265. Defendant's actions and corporate decisions surrounding the allegations made herein were made from and in New York.

266. Defendant's breaches of duty to Plaintiffs and Class Members emanated from New York.

267. Application of New York law to the Classes with respect to Plaintiffs' and Class Members' claims is neither arbitrary nor fundamentally unfair because New York has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiffs and the Classes.

268. Under New York's choice of law principles, which are applicable to this action, the common law of New York applies to the nationwide common law claims of all Class Members.

269. New York has a significant interest in regulating the conduct of businesses operating within its borders. New York also has the most significant relationship to Defendant, as it is headquartered in New York, its executives and officers are located in New York and the decisions giving rise to the allegations and claims asserted herein were made in New York. Thus, there is no conflict in applying New York law to non-resident consumers such as some of the potential Class Members.

## CAUSES OF ACTION

### COUNT I
**Violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510, *et seq*.**
**Unauthorized Interception, Use and Disclosure**

270. Plaintiffs and Class Members repeat and re-allege the allegations in paragraphs 1-269 as if fully set forth herein.

271. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception, or the attempted or procured interception, of any wire, oral, or electronic communication. 18 U.S.C. § 2511(1)(a).

272. The ECPA protects both sent and received communications.

273. The ECPA, specifically 18 U.S.C. § 2520(a), provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

274. Under the ECPA, a court may award as damages whichever is the greater of (a) the actual damages suffered by the plaintiff and any profits made by the defendant as a result of the violation, or (b) statutory damages of whichever is the greater of $100 a day for each day of the violation or $10,000. 18 U.S.C. § 2520(c)(2).

275. The transmissions of Plaintiffs' and Class Members' communications and information, which included Private Information, to Centralus via Centralus's Websites is a "communication" under the ECPA's definition under 18 U.S.C. § 2510(12).

276. Moreover, such transmissions constitute "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

277. The ECPA defines "content" when used with respect to electronic communications to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

278. The ECPA defines "interception" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

279. The ECPA defines "electronic, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5).

280. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The cookies Centralus, Google, and The Help Desk use to track Users' communications;
b. Users' browsers;
c. Users' computing devices;
d. Centralus's servers for its Websites; and
e. The tracking technologies, specifically Google DoubleClick and The Trade Desk, deployed by Centralus to effectuate the sending and acquisition of Users' and patients' sensitive and private communications.

281. Plaintiffs and Class Members' interactions with Centralus's Websites are electronic communications under the ECPA.

282. By utilizing and embedding tracking technologies such as Google DoubleClick and The Trade Desk on its Websites and/or servers, Centralus intentionally intercepted, endeavored to intercept, and/or procured another person to intercept the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

283. Specifically, Centralus intercepted Plaintiffs' and Class Members' electronic communications via Google DoubleClick and The Trade Desk, which tracked, stored, and

unlawfully disclosed Plaintiffs' and Class Members' Private Information to Google, The Trade Desk, and other third parties.

284. Centralus intercepted communications that included, but are not limited to, communications to/from Plaintiffs and Class Members regarding their PII and PHI, including first and last name, email address, IP address, and health information relevant to Plaintiffs' and Class Members' medical conditions and treatment.

285. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to Google, The Trade Desk, and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Centralus violated 18 U.S.C. § 2511(1)(c).

286. By intentionally using or endeavoring to use the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the Information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Centralus violated 18 U.S.C. § 2511(1)(d).

287. Centralus is a "party to the communication" with respect to patient communications. However, the so-called "crime-tort exception" applies here because Centralus intercepted the contents of Plaintiffs' and Class Members' electronic communications for the independent purpose of committing criminal and tortious acts in violation of the Constitution or laws of the United States or of any State – namely, to violate HIPAA, to breach its contracts with and fiduciary and confidentiality duties owed to Plaintiffs and Class Members, and to invade their privacy, among others. 18 U.S.C. § 2511(2)(d).

288. Specifically, by the acts alleged herein, Centralus knowingly and intentionally

intercepted the contents of Plaintiffs' and Class Members' electronic communications, which included their Private Information, without their knowledge or consent, for the express purpose of sharing those communications and private information with third parties Google and The Help Desk, which is a crime in violation of HIPAA.

289. New York federal courts have generally held that the unauthorized disclosure of Private Information to third-party advertising platforms for profit is a criminal act under HIPAA, which invokes the ECPA crime-tort exception and overcomes the one-party consent rule. *See*, *e.g.*, *Cooper v. Mount Sinai Health System*, 742 F. Supp. 3d 369 (S.D.N.Y. July 30, 2024) (transmitting PHI to Meta for advertising constituted "an independent criminal act under HIPAA," satisfying the ECPA crime-tort exception); *Kane v. University of Rochester*, 2024 WL 1178340, 2024 U.S. Dist. LEXIS 48515 (W.D.N.Y. Mar. 19, 2024) (using Meta Pixel to transmit patients' PHI and PII to Facebook for marketing profit plausibly alleged an ECPA interception); *Gay v. Garnet Health,* 2024 WL 4203263, 2024 U.S. Dist. LEXIS 168515 (S.D.N.Y. Sept. 16, 2024) (using tracking pixels to forward PHI and PII to Facebook and Google for profit sustained the ECPA claim); *Pattison v. Teladoc Health, Inc.,* 2025 WL 1756364, 2025 U.S. Dist. LEXIS 121044 (S.D.N.Y. June 25, 2025) (disclosure of PHI to Facebook and Google "for the purpose of violating HIPAA" independently triggered the crime-tort exception).

290. Moreover, Centralus intentionally used tracking technologies such as Google DoubleClick and The Trade Desk to intercept, track, and utilize Plaintiffs' and Class Members' wire and electronic communications, which included their Private Information, to increase its profit margins and for its own financial benefit.

291. Centralus was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communications.

292. Plaintiffs and Class Members did not authorize Centralus to acquire the content of their communications for purposes of invading Plaintiffs' and Class Members' privacy via the tracking technologies such as Google DoubleClick and The Trade Desk.

293. Any purported consent that Centralus received from Plaintiffs and Class Members was not valid.

294. In intercepting and transmitting to third parties the content of Plaintiffs' and Class Members' communications relating to the browsing of Centralus's Websites, including researching providers, medical conditions, and treatment, accessing the patient portals, and typing queries in the search bar, Centralus's purpose was criminal and tortious and designed to violate federal and state law, including as described above, and a conversation and misuse of Private Information that would be highly offensive to a reasonable person.

295. Centralus's acquisition of patient communications that were used and disclosed to Google, The Trade Desk, and other third parties was also done for purposes of committing criminal and tortious acts in violation of the laws of the United States and New York (as described herein).

296. Consumers have the right to rely upon the promises that companies make to them. Centralus accomplished its tracking through deceit and disregard, such that an actionable claim may be made, in that it was accomplished through source code that caused Google and The Trade Desk tracking technologies and cookies (including but not limited to the IDE and the TDID cookies) to be deposited on Plaintiffs' and Class Members' computing devices.

297. Centralus's unlawful scheme in this action further includes:

a. the false and misleading statements and omissions in its privacy policies set forth above, including the statements and omissions recited in the breach of contract and negligence claims below; and/or

b. the intentional or knowing placement of Google and The Trade Desk cookies on patient computing devices, which cookies were disguised as

first-party cookies from Centralus so that they would not be blocked.

298. Centralus also unlawfully invaded, took, converted, disclosed, and transferred to third parties Plaintiffs' and Class Members' property, including:

a. property rights to their confidential Private Information and their right to determine whether such information remains confidential and exclusive right to determine who may collect and/or use such information for marketing purposes; and

b. property rights to determine who has access to their computing devices.

299. Centralus further unlawfully invaded, took, converted, disclosed, and transferred to third parties Plaintiffs' and Class Members' property:

a. with knowledge that: (1) Centralus did not have the right to share such data without written authorization; (2) courts had determined that a healthcare providers' use of tracking technologies gave rise to claims for invasion of privacy and violations of state criminal statutes; (3) a reasonable user would not understand that third parties like Google and The Trade Desk were collecting their Private Information based on their activities on Centralus's Websites; and (4) the subsequent use of health information for advertising was a further invasion of such property rights in making their own exclusive use of their Private Information for any purpose not related to the provision of their healthcare; and

b. with the intent to: (1) acquire Plaintiffs' and Class Members' Private Information without their authorization and without their healthcare providers or covered entities obtaining the right to share such information; (2) use Plaintiffs' and Class Members' Private Information without their authorization and (3) gain access to Plaintiffs' and Class Members' personal computing devices through hidden and disguised tracking technologies and cookies.

300. As a direct and proximate result of Centralus's violation of the ECPA, Plaintiffs and Class Members were damaged by Centralus's conduct.

301. Plaintiffs, individually, on behalf of the Class Members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT II**
**Negligence**

302. Plaintiffs and Class Members repeat and re-allege the allegations in paragraphs 1-269 as if fully set forth herein.

303. Upon accepting, storing, and controlling the Private Information of Plaintiffs and the Classes, Centralus owed – and continues to owe – a duty to Plaintiffs and the Classes to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information.

304. Centralus breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

305. It was reasonably foreseeable that Centralus's failures to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information through its use of Google DoubleClick, The Trade Desk, and other tracking technologies would result in unauthorized third parties – specifically Google and The Trade Desk – gaining unlawful access to such Private Information.

306. Centralus's duty of care to use reasonable measures to secure and safeguard Plaintiffs' and Class Members' Private Information arose due to the special relationship that existed between Centralus and its patients, which is recognized by statute, regulations and the common law.

307. In addition, Centralus had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of patients' healthcare information and set forth the conditions under which such information can be used and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for but to any entity that may have access to healthcare information about a patient that – if it were to fall into the wrong hands – could present a risk of harm to the patient's finances or reputation.

308. Centralus's own conduct also created a foreseeable risk of harm to Plaintiffs and Class Members and their Private Information. Centralus's misconduct included the failure to (a) secure Plaintiffs' and Class Members' Private Information; (b) comply with industry-standard data security practices; (c) implement adequate Websites and event monitoring; and (d) implement the systems, policies and procedures necessary to prevent unauthorized disclosures resulting from the use of Google DoubleClick, The Trade Desk, and other tracking technologies.

309. As a direct result of Centralus's breach of its duty of confidentiality and privacy and the disclosure of Plaintiffs' and Class Members' Private Information, Plaintiffs and the Classes have suffered damages that include, without limitation, loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

310. Centralus's wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiffs' and Class Members' Private Information constituted (and continues to constitute) negligence at common law.

311. Plaintiffs and the Classes are entitled to recover damages in an amount to be determined at trial.

## COUNT III
## Breach of Implied Contract

312. Plaintiffs and Class Members repeat and re-allege the allegations in paragraphs 1-269 as if fully set forth herein.

313. Centralus required Plaintiffs and Class Members to provide their Private Information, including their names, email addresses, phone numbers, computer IP addresses, appointment and health information, and other content submitted to Centralus's Websites as a

condition of their using such Websites and receiving healthcare services from Centralus.

314. When Plaintiffs and Class Members provided their data to Centralus in exchange for these services, they entered into an implied contract pursuant to which Centralus agreed to safeguard and not disclose their Private Information without consent.

315. Plaintiffs and Class Members accepted Centralus's offers and provided their Private Information to Centralus.

316. Plaintiffs and Class Members fully performed their obligations under the contract with Centralus.

317. Centralus's relevant privacy policies and representations require it to take appropriate steps to safeguard the Private Information entrusted to it by the Plaintiffs and Class Members.

318. Centralus breached these agreements, which directly and/or proximately caused Plaintiffs and Class Members to suffer damages, including nominal damages.

319. Plaintiffs and Class Members would not have entrusted Centralus with their Private Information in the absence of an implied contract between them and Centralus obligating them not to disclose this Private Information without consent.

320. Centralus breached these implied contracts by disclosing Plaintiffs' and Class Members' Private Information to third parties, including Google and The Trade Desk.

321. As a direct and proximate result of Centralus's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein. Plaintiffs and Class Members would not have used Centralus's Websites or services had they known their Private Information would be disclosed, and/or would have acted differently.

322. Plaintiffs and Class Members are entitled to compensatory and consequential

damages because of Centralus's breach of implied contract.

**COUNT IV**
**Breach of Fiduciary Duty**

323. Plaintiffs and Class Members repeat and re-allege the allegations in paragraphs 1-269 as if fully set forth herein.

324. A relationship existed between Plaintiffs and Class Members on the one hand and Centralus on the other, in which Plaintiffs and Class Members put their trust in Centralus to protect their Private Information, and Centralus accepted that trust.

325. Centralus breached the fiduciary duty that it owed to Plaintiffs and Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and instead intentionally disclosing, the Private Information of Plaintiffs and Class Members.

326. Centralus's breach of fiduciary duty was a legal cause of damage to Plaintiffs and Class Members.

327. But for Centralus's breach of fiduciary duty, the damage to Plaintiffs and Class Members would not have occurred.

328. Centralus's breach of fiduciary duty contributed substantially to producing the damage to Plaintiffs and Class Members.

329. As a direct and proximate result of Centralus's breach of fiduciary duty, Plaintiffs and Class Members are entitled to and do demand actual, consequential and/or nominal damages, injunctive relief, and all other relief allowed by law.

**COUNT V**
**Unjust Enrichment**

330. Plaintiffs and Class Members repeat and re-allege the allegations in paragraphs 1-

269 as if fully set forth herein.

331. Centralus benefited from Plaintiffs' and Class Members' Private Information and unjustly retained those benefits at Plaintiffs' and Class Members' expense.

332. Plaintiffs and Class Members conferred a benefit upon Centralus in the form of the monetizable Private Information that Centralus collected from them and disclosed to third parties, including Google and The Trade Desk, without authorization and proper compensation.

333. Centralus consciously collected and used this information for its own gain, providing Centralus with economic, intangible and other benefits, including substantial monetary compensation and increased advertising efficiencies.

334. Centralus unjustly retained those benefits at the expense of Plaintiffs and Class Members because Centralus's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiff or Class Members.

335. The benefits that Centralus derived from Plaintiffs and Class Members were not offered by Plaintiff or Class members gratuitously and, thus, rightly belong to Plaintiffs and Class Members.

336. It would be inequitable under unjust enrichment principles and in New York for Centralus to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

337. Centralus should be compelled to disgorge into a common fund for the benefit of Plaintiffs and the Classes all unlawful or inequitable proceeds that Centralus received, and such other relief as the Court may deem just and proper.

## COUNT VI
## Breach of Confidence

338. Plaintiffs and Class Members repeat and re-allege the allegations in paragraphs 1-

269 as if fully set forth herein.

339. Medical providers, such as Centralus, have a duty to their patients to keep non-public medical information confidential.

340. Plaintiffs and Class Members had reasonable expectations of privacy in the responses and communications entrusted to Centralus through their Websites, which included highly sensitive Private Information.

341. Contrary to their duties as health care institutions and their express promises of confidentiality, Centralus installed the tracking technologies Google DoubleClick and The Trade Desk to collect, disclose, and transmit to third parties Plaintiffs' and Class Members' Private Information, including data relating to Plaintiffs' and Class Members' health.

342. These disclosures were made without Plaintiffs' or Class Members' knowledge, consent, or authorization.

343. The third-party recipients included, but may not be limited to, Google and The Trade Desk.

344. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

345. As a direct and proximate cause of Centralus's unauthorized disclosures of Plaintiffs' and Class Members' Private Information, Plaintiffs and Class Members were damaged by Centralus's breach of confidentiality in that (a) sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private; (b) Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements; (c) Centralus eroded the essential confidential nature of health services that Plaintiffs and Class Members participated in; (d) general damages for invasion of their rights in an

amount to be determined by a jury at trial; (e) nominal damages for each independent violation; (f) the unauthorized use of something of value (the highly sensitive Private Information) that belonged to Plaintiffs and Class Members and the obtaining of a benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation to Plaintiff or Class Members for the unauthorized use of such data; (g) diminishment of the value of Plaintiffs' and Class Members' Private Information; and (h) violation of property rights Plaintiffs and Class Members have in their Private Information.

## COUNT VII
## Constructive Bailment

346. Plaintiffs and Class Members repeat and re-allege the allegations in paragraphs 1-269 as if fully set forth herein.

347. Centralus acquired and was obligated to safeguard the Private Information of Plaintiffs and Class Members.

348. Centralus accepted possession and took control of Plaintiffs' and Class Members' Private Information under such circumstances that the law imposes an obligation to safeguard the property of another.

349. Specifically, a constructive bailment arises when Centralus, as is the case here, takes lawful possession of the property of another and has a duty to account for that property, without intending to appropriate it.

350. Constructive bailments do not require an express assumption of duties and may arise from the bare fact of the thing coming into the actual possession and control of a person fortuitously or by mistake as to the duty or ability of the recipient to affect the purpose contemplated by the absolute owner.

351. During the constructive bailment, Centralus owed a duty to Plaintiffs and Class

Members to exercise reasonable care, diligence, and prudence in protecting their Private Information.

352. Centralus breached its duty under the constructive bailment by failing to take appropriate measures to safeguard and protect Plaintiffs' and Class Members' Private Information, resulting in the unlawful and unauthorized access to, disclosure, and misuse of such Information to third parties such as Google and The Trade Desk.

353. Centralus further breached its duty to safeguard Plaintiffs' and Class Members' Private Information by failing to notify them individually in a timely and accurate manner that their Private Information had been disclosed to third parties without Plaintiffs' and Class Members' knowledge, consent, or explicit authorization.

354. As a direct and proximate result of Centralus's breach of its constructive bailment, Plaintiffs and Class Members have suffered compensable damages that were reasonably foreseeable to Centralus, including but not limited to, the damages set forth herein.

## COUNT VIII
## Implied Covenant of Good Faith & Fair Dealing

355. Plaintiffs and Class Members repeat and re-allege the allegations in paragraphs 1-269 as if fully set forth herein.

356. Plaintiffs and Class Members entered into valid, binding, and enforceable implied contracts with Centralus, as alleged above.

357. These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual obligations (both explicit and fairly implied) and not to impair the rights of the other parties to receive the rights, benefits, and reasonable expectations under the contracts.

358. These included the implied covenants that Centralus would act fairly and in good

faith in carrying out its contractual obligations to take reasonable measures to protect Plaintiffs' and Class Members' Private Information and to comply with industry standards and federal and state laws and regulations.

359. A "special relationship" exists between Centralus and Plaintiffs and Class Members. Centralus entered into a "special relationship" with Plaintiffs and Class Members who sought healthcare services through Centralus and, in doing so, entrusted Centralus, pursuant to its requirements, with their Private Information.

360. Despite this special relationship with Plaintiffs, Centralus did not act in good faith and with fair dealing to protect Plaintiffs' and Class Members' Private Information.

361. Plaintiffs and Class Members performed all conditions, covenants, obligations and promises owed to Centralus.

362. Centralus's failure to act in good faith denied Plaintiffs and Class Members the full benefit of their bargain and also caused Plaintiff and Class Members to suffer actual damages resulting from the disclosure and interception of their Private Information and they remain at imminent risk of suffering additional damages in the future.

363. Accordingly, Plaintiffs and Class Members have been injured as a result of Centralus's breach of the covenant of good faith and fair dealing and are entitled to damages and/or restitution in an amount to be proven at trial.

## COUNT IX
**Violation of the New York Deceptive Trade Practices Act**
**New York Gen. Bus. Law § 349, *et seq.***

364. Plaintiffs and Class Members repeat and re-allege the allegations in paragraphs 1-269 as if fully set forth herein.

365. By the acts and conduct alleged herein, Centralus committed unfair or deceptive

acts and practices by:

a. promising to maintain the privacy and security of Plaintiffs' and Class Members' PHI as required by law;

b. installing the tracking technologies Google DoubleClick and The Trade Desk to operate as intended and transmit Plaintiffs' and Class Members' Private Information without their authorization to third parties Google and The Trade Desk;

c. failing to disclose or omitting material facts to Plaintiffs and Class Members regarding the disclosure of their Private Information to third parties, including Google and The Trade Desk;

d. making false statements of fact to Plaintiffs and Class Members regarding the disclosure of their Private Information to third parties, including Google and The Trade Desk;

e. failing to take proper action to ensure the tracking technologies were configured to prevent unlawful disclosure of Plaintiffs' and Class Members' Private Information; and

f. unlawfully disclosing Plaintiffs' and Class Members' Private Information to third parties, including Google and The Trade Desk.

366. These unfair acts and practices violated duties imposed by laws, including but not limited to, the Federal Trade Commission Act, HIPAA and NY GBL § 349.

367. Centralus's actions also constitute deceptive and unfair acts or practices because Centralus knew it misrepresented and/or failed to disclose to Plaintiffs and Class Members that their healthcare-related communications via the Websites would be disclosed to third parties Google and The Trade Desk.

368. Centralus's actions also constitute deceptive and unfair acts or practices because Centralus intended that Plaintiffs and Class Members rely on its deceptive and unfair acts and practices, and the concealment and omission of material facts in connection with Centralus's offering of goods and services.

369. Specifically, Centralus was aware that Plaintiffs and Class Members depended and

relied upon it to keep confidential their communications and Private Information, and Centralus instead disclosed that information to third parties Google and The Trade Desk.

370. In addition, Centralus's material failure to disclose that Centralus collects and shares Plaintiffs' and Class Members' Private Information for marketing purposes with Google and The Trade Desk, for Centralus's own benefit, constitutes an unfair act or practice prohibited by the NY GBL § 349. Centralus's actions were immoral, unethical and unscrupulous.

371. Plaintiffs had reasonable expectations of privacy in their communications exchanged with Centralus, including communications exchanged on Centralus's Websites.

372. Plaintiffs' reasonable expectations of privacy in the communications exchanged with Centralus were further buttressed by Centralus's express promises in its Privacy Policy and HIPAA Privacy Notice.

373. Contrary to its duties as a medical provider and its express promises of confidentiality, Centralus deployed the tracking technologies, including Google DoubleClick and The Trade Desk, to disclose and transmit Plaintiffs' personally identifiable, non-public medical information and the contents of their communications exchanged with Centralus to third parties, *i.e.*, Google and The Trade Desk.

374. Centralus's disclosures of Plaintiffs' and Class Members' Private Information were made without their knowledge, consent, or authorization, and were unprivileged.

375. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

376. Centralus willfully, knowingly, intentionally and voluntarily engaged in the aforementioned acts when it incorporated the tracking technologies with knowledge of their purpose and functionality.

377. The harm described herein could not have been avoided by Plaintiffs and Class Members through the exercise of ordinary diligence.

378. As a result of Centralus's wrongful conduct, Plaintiffs were injured in that they never would have provided their PII and PHI to Centralus, or purchased Centralus's services, had they known or been told that Centralus would share their confidential and sensitive Private Information with Google, The Trade Desk, or any other third party.

379. As a direct and proximate result of Centralus's multiple, separate violations of NY GBL § 349, Plaintiffs and Class Members have suffered harm, including financial losses related to the payments or services made to Centralus that Plaintiffs and Class Members would not have made had they known of Centralus's disclosure of their PII and PHI to third parties Google and The Trade Desk; lost control over the value of their PII and PHI; and other harm resulting from the unauthorized use or threat of unauthorized use of their PII and PHI, including for unwanted solicitations or marketing, entitling them to damages in an amount to be proven at trial.

380. Centralus's acts, practices and omissions were done in the course of Centralus's business of furnishing healthcare-related services to consumers in the State of New York.

381. Plaintiffs bring this action on behalf of themselves and Class Members for the relief requested above and for the public benefit to promote the public interests in the provision of truthful, fair information to allow consumers to make informed decisions and to protect Plaintiffs, Class Members, and the public from Centralus's unfair, deceptive and unlawful practices. Centralus's wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

382. As a result, Plaintiffs and Class Members are entitled to damages in an amount to be determined at trial, along with their costs and attorneys' fees incurred in this action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Bethanie Keem-Calhoun and Amanda Saygi respectfully pray for judgment in their favor and against Defendant Centralus as follows:

A. For an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

C. For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to patient data collection, storage, and safety, and to disclose with specificity the type of PII and PHI disclosed to third parties;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E. For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

F. For an award of punitive damages, as allowable by law;

G. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

H. Pre- and post-judgment interest on any amounts awarded; and

I. Such other and further relief as this Honorable Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs Bethanie Keem-Calhoun and Amanda Saygi hereby demand that this matter be tried before a jury.

Date: August 20, 2026

Respectfully submitted,

Stephen DeNittis, Esq.
DENITTIS OSEFCHEN PRINCE, P.C.
315 Madison Ave., 3rd Floor
New York, New York 10017
Telephone: (646) 979-3642
Facsimile: (856) 797-9978
Email: sdenittis@denittislaw.com

*Attorneys for Plaintiffs & Putative Classes*